## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Avadel Specialty Pharmaceuticals, LLC,[1] | Case No. 19-10248 (CSS) |
| Debtor. | |

## DECLARATION OF GREGORY J. DIVIS IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

I, **GREGORY J. DIVIS**, hereby declare, under penalty of perjury, as follows:

1.      I am President of Avadel Specialty Pharmaceuticals, LLC (the "**Debtor**" or "**ASP**").  I perform my duties from the Debtor's corporate offices located at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, MO 63005.

2.      I have more than twenty-five years of experience in the life sciences and pharmaceuticals industry.  Before joining ASP, I served as an operating partner at Linden Capital Partners, a Chicago-based private equity firm focused exclusively on healthcare.  Prior to that, I served in senior executive roles at Lumara Health, Inc., Ther-Rx Corporation, Sanofi-Aventis, and Schering-Plough Corporation.  As a result of this extensive background, I have deep experience in the business, financial and other aspects of the life sciences and pharmaceuticals industry.

3.      I was appointed Vice President of ASP in August 2017 and became its President in January 2019.  In these capacities, I have become familiar with the Debtor's day-to-day operations, business and financial affairs.

4.      I submit this declaration (the "**Declaration**") to assist the Court, as well as creditors and other parties in interest, in understanding the circumstances that compelled the commencement

---

[1]  The business address and the last four (4) digits of the Debtor's federal tax identification number is Avadel Specialty Pharmaceuticals, LLC, 16640 Chesterfield Grove Road, Suite 200, Chesterfield, MO 63005 (8959).

of this chapter 11 case (the "**Chapter 11 Case**") and also in support of:  (a) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtor has requested from the Court in the form of various motions and applications filed on or about the Petition Date and described herein (collectively, the "**First Day Motions**").

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      Part I of this Declaration provides an introduction of the Debtor and this Chapter 11 Case.  Part II of this Declaration describes in more detail the Debtor's corporate structure, business, prepetition capital structure, the developments that led to the Debtor's chapter 11 filing, and the Debtor's goals in this Chapter 11 Case.  Part III describes the Debtor's request for authority to enter into the DIP Facility (as defined below) and the facts in support thereof.  Part IV sets forth the relief requested by the various First Day Motions and the facts supporting such relief.

## I.
## Introduction

7.      ASP is a pharmaceutical company engaged in the business of the distribution, sale and marketing of pharmaceutical products.  ASP focuses on providing innovative medicines for chronic urological disorders.  ASP's sole commercial product, NOCTIVA™, provides for the treatment of nocturia due to nocturnal polyuria in adults who awaken at least two times per night

to void, and is approved in the United States by the U.S. Food and Drug Administration ("**FDA**"). NOCTIVA™ is the first FDA-approved treatment proven to help adults with nocturia due to nocturnal polyuria, a condition which causes the kidneys to overproduce urine at night. NOCTIVA™ safely and effectively treats a condition that causes more than 40 million Americans to wake two or more times per night to use the bathroom, which prevents them from getting a good night's sleep.

8.      ASP has experienced several market challenges in its efforts to commercialize and increase sales volume while the overall growth for its product has been slower than anticipated. As a result, ASP has experienced losses since its inception, and as of the Petition Date, has an accumulated deficit, due in part to costs relating to underachieving sales, unanticipated competition, and certain supply agreements.  Making matters worse, sales projections based on the current growth trend illustrate a substantially longer period of operating losses than originally assumed.

9.      ASP's objectives in this Chapter 11 Case are to (a) sell its assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for proposals for a sale of all or any combination of its assets, including but not limited to a sale of all or substantially all assets, or a sale of specific assets in one or more lots, or for only its NOCTIVA™ inventory, (b) liquidate any remaining assets, and (c) wind down its operations in an orderly manner.

## II.
## Background

### A.    The Debtor's Corporate Structure

10.      The Debtor is a limited liability company organized under the laws of the State of Delaware.  The Debtor is a direct and indirect subsidiary of non-debtors Avadel U.S. Holdings,

Inc. (**"AUSH"**) and Avadel Pharmaceuticals plc, respectively.  A chart depicting the Debtor's

corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

11.    ASP's indirect parent, Avadel Pharmaceuticals plc, is formed under the laws of

Ireland and publicly traded on the NASDAQ Global Market under the symbol AVDL.  I was

appointed the Interim Chief Executive Officer of Avadel Pharmaceuticals plc in December 2018.

Avadel Pharmaceuticals plc is the direct or indirect owner of several subsidiaries (collectively, the

"**Avadel Group**").  The Avadel Group, including Avadel Pharmaceuticals plc, is currently

undergoing an out-of-court restructuring to right-size its headcount, reduce operational expenses,

and increase the economic viability and sustainably of its underlying business model.  As part of

the ongoing restructuring, the Avadel Group is conducting a reduction in its collective workforce.

The Debtor's Chapter 11 Case is a part of the Avadel Group's broader restructuring efforts.

**B.    The Debtor's Business**

12.    The Debtor is a pharmaceutical company engaged in the business of the

distribution, sale and marketing of pharmaceutical products.  The Debtor focuses on providing

innovative medicines for chronic urological conditions.  As part of its business, the Debtor

undertakes launching, marketing, market researching, distributing, and selling pharmaceutical

products.  The Debtor's sole commercial product as of the Petition Date is NOCTIVA™.

13.    NOCTIVA™ is a prescription medicine nasal (nose) spray used in adults who wake

up two or more times during the night to urinate due to a condition called nocturnal polyuria.

Nocturnal polyuria is a condition where the body makes too much urine at night.  NOCTIVA™'s

innovative formulation works in the kidneys to lessen nighttime urine production.  The nasal spray

is a proprietary emulsified microdose of desmopressin combined with a permeation enhancer that

increases the transport of the desmopressin across the nasal mucosa.  Delivered via a unique spray

pattern, NOCTIVA™'s breakthrough formulation substantially increases the bioavailability of the active drug, allowing for microdosing, rapid absorption and consistency from dose to dose.

14.    In March 2017, the FDA approved NOCTIVA™ for the treatment of nocturia due to nocturnal polyuria in adults who awaken at least two times per night to urinate. NOCTIVA™ is the first FDA-approved treatment for this condition.

15.    On September 1, 2017, the Debtor entered into the Exclusive License and Assignments Agreement (the "**License Agreement**") with Serenity Pharmaceuticals, LLC ("**Serenity**") under which the Debtor was granted the exclusive right to develop, market, and sell NOCTIVA™ in the United States and Canada. Under the terms of the License Agreement, Serenity received two one-time payments from the Debtor in the aggregate amount of $70 million in consideration of the license and sublicense granted to the Debtor. The first payment was an upfront payment of $50 million (the "**Initial Payment**") due on the effective date of the License Agreement. The second payment was a $20 million payment (the "**Launch Payment**") due by the earlier of: (a) 30 days after NOCTIVA™ was launched and available for commercial sale to patients; or (b) June 30, 2018. The License Agreement requires the Debtor to devote commercially reasonable efforts to the commercialization of NOCTIVA™ and provides that Serenity is entitled to certain commercialization milestone payments, as well as royalties from product sales.

16.    The Debtor's distribution of NOCTIVA™ consists of several phases: (a) manufacturing the raw ingredients for its products (i.e., the active pharmaceutical ingredient (the "**API**")), (b) manufacturing the API into consumable pharmaceuticals, (c) testing the pharmaceuticals to conduct both analytical release studies and stability samples, (d) packaging the commercial product, and (e) distribution to ensure that the commercial products and samples make their way to end-users. The Debtor does not produce or distribute NOCTIVA™ itself. Instead,

the Debtor manages its production and distribution of NOCTIVA™ through third-party manufacturing, distribution and supply agreements.  Outsourcing manufacturing and supply allows the Debtor to focus on the commercialization of NOCTIVA™.

17.    The Debtor's primary third-party manufacturer of NOCTIVA™ is Renaissance Lakewood, LLC f/k/a DPT Lakewood, LLC ("**Renaissance**").  The Debtor's manufacturing and supply agreement (the "**Manufacturing Agreement**") with Renaissance was previously executed by Serenity and assigned to the Debtor as part of the License Agreement.  Under the Manufacturing Agreement, the Debtor is required to purchase a minimum of 400,000 units of the manufactured product each year regardless of need.  In the event the Debtor fails to purchase the minimum requirements in any given calendar year, the Debtor is required to pay the shortfall to Renaissance. Since entering into the License Agreement, the Debtor has spent approximately $4.8 million on NOCTIVA™ inventory.  Going forward, on an annual basis, the Debtor's costs associated with the Manufacturing Agreement are expected to exceed $3.5 million.

18.    Before the Petition Date, AUSH funded the Debtor's operations.  AUSH funded $70 million on account of the Initial Payment and the Launch Payment paid by the Debtor to Serenity.  In addition, AUSH funded the Debtor's commercialization efforts.  In sum, AUSH has funded the Debtor in the aggregate amount of approximately $152 million since September 2017. The Debtor has no other secured or unsecured funded indebtedness.

19.    As of the Petition Date, the Debtor was largely current with its third-party accounts payable.  The Debtor's unsecured obligations consisting of accounts payable to various third-party vendors and other creditors total approximately $1.7 million.

**C.    Events Leading up to this Chapter 11 Case**

20.    ASP's success is predicated upon its ability to effectively and successfully commercialize NOCTIVA™.  Regrettably, NOCTIVA™ has underperformed since its launch.

Since the rollout, sales growth has been lower than projected and efforts to increase sales volume have been confronted with minimal overall market demand for FDA approved pharmaceutical products in this space. Revised sales projections are substantially below the projections made concurrently with entering into the License Agreement.

21.    Despite significant time and investment, NOCTIVA™ has not flourished on the market for several reasons. *First*, health care professionals have been unwilling to try (or adopt) NOCTIVA™. Physicians almost exclusively treat their patients with other agents that target conditions such as overactive bladder and prostate due to the high prevalence of co-morbidity between these conditions and nocturia due to nocturnal polyuria. *Second*, underlying concerns with regard to the potential risks of a serious side effect associated with the active ingredient in NOCTIVA™ (desmopressin acetate), based on prior experience with older formulations of the same active ingredient, have resulted in a hesitancy overall by health care professionals to adopt and/or try NOCTIVA™ for their patients. *Third*, serum sodium monitoring requirements, which are not necessarily in the ordinary course for physicians treating patients suffering from nocturia due to nocturnal polyuria, have inhibited healthcare professionals' overall willingness to broadly adopt NOCTIVA™. *Lastly*, given the evolution of patient benefit designs and the restrictions managed care companies have placed on NOCTIVA™, despite significant efforts, during the first approximately nine months of commercialization, over 55% of all prescriptions were dispensed for free resulting in no corresponding positive gross margin. Furthermore, when combined with the additional qualified and eligible financial assistance provided for insured beneficiaries with a covered benefit for NOCTIVA™, the resulting gross margin has been substantially lower than originally assumed. For these and other reasons, approximately $80 million in additional

investments since September 2017 (exclusive of the Initial Payment and Launch Payment) has yielded less than $3 million in net sales.

22.     In this challenging environment, ASP's innovative commercialization and development efforts have been key.  Such efforts, however, have required significant investment and put immense pressure on ASP's finances.  As a result of the significant investments made with the objective of driving growth, ASP incurred significant losses and requires additional capital to provide a bridge to profitability.  ASP's financial woes have been compounded by the incurrence of the Initial Payment and the Launch Payment, as well as the continuing financial obligations under the License Agreement and Manufacturing Agreement.

23.     In light of the Avadel Group's broader restructuring, and as a result of its own ongoing financial and capital constraints, AUSH determined that it could no longer continue to fund ASP.  Accordingly, with no other access to capital and a looming cash crunch, ASP began a strategic review process to explore potential alternatives to maximize value, including a sale, restructuring, or other transaction.  ASP began this process in November 2018 by looking for a co-promoter that might be interested in assisting in the promotion of NOCTIVA™ as a partner to extend the Debtor's promotional reach while attempting to mitigate the cost burden to ASP.  The Debtor contacted twenty pharmaceutical companies and strategic buyers in order to assess their interest level in a strategic transaction with ASP.  However, none of these parties made any proposals to enter into a co-promotion agreement with ASP.

24.     Following its unsuccessful efforts to find a co-promoter, the Debtor began an informal process to identify a sublicensee to assume its obligations, which would also require the consent of Serenity.  That process commenced in December 2018.  The Debtor discretely contacted potential parties, including pharmaceutical companies and other potential strategic buyers.  As of

the Petition Date, five parties expressed an interest in buying some or substantially all of the Debtor's assets. These five parties signed non-disclosure agreements and conducted initial diligence. In connection with these discussions, a virtual data room containing extensive information about ASP, including documents describing ASP's business and financial results in considerable detail, was established for those parties who had entered into non-disclosure agreements and requested such information. One of the five interested parties conducted substantial diligence, but had not completed its diligence or discussed financial or other deal terms for a sale before the Petition Date.

25.     Before conversations progressed, the Debtor determined that, given the difficulties in achieving sales projections and its deteriorating liquidity position, the best available option to maximize value and/or reasonably execute a strategic transaction was through an in-court sale pursuant to section 363 of Bankruptcy Code. Accordingly, in light of its precarious financial situation and the apparent absence of any strategic alternatives other than an asset sale under the aegis of Chapter 11, the Debtor commenced this Chapter 11 Case to maximize value for the benefit of its estate and creditors.

**D.     Objectives for this Chapter 11 Case**

26.     The Debtor intends to sell its assets pursuant to section 363 of the Bankruptcy Code. As set forth in the *Motion of the Debtor for Entry of Orders (I)(A) Approving Bid Procedures Relating to the Sale of Assets of the Debtor, (B) Establishing Procedures In Connection With the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, and (D) Granting Related Relief; and (II) (A) Authorizing the Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Final Purchase Agreement; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto; and (D) Granting Related Relief* (the

"**Sale Motion**") filed contemporaneously herewith, the Debtor contemplates a flexible section 363 sale process pursuant to which potential bidders may bid on all of the Debtor's assets, one or more specific asset – such as the Debtor's new drug application for NOCTIVA™ and its inventory or for only its NOCTIVA™ inventory – or other combinations.  As more fully set forth in the Sale Motion, the Debtor has retained an investment banker to run the sale process, which the Debtor contemplates running during a seven-week period.  The investment banker will leverage the Debtor's prepetition efforts to pursue a sale and other transaction.

27.     After the assets sales are consummated, the Debtor intends to wind down any remaining operations and liquidate any assets as may be necessary and appropriate.

### III.
### The DIP Facility

28.     Approval of the DIP Facility is necessary to meet the Debtor's immediate need for liquidity.  As set forth above, before the Petition Date, AUSH funded the Debtor's operations.  As projected in the budget attached as Exhibit A to the DIP Credit Agreement (the "<u>Budget</u>"), after the Petition Date, the Debtor's projected revenues are likely to be insufficient to fund adequately the Debtor's operations and working capital needs and the additional cash flow required to fund the administrative expenses of this Chapter 11 Case.  Absent approval of the DIP Facility, the Debtor will almost certainly experience business disruptions.  Moreover, the Debtor believes that approved and demonstrated access to liquidity through the DIP Facility is essential to provide the Debtor's employees, vendors and service providers, and other stakeholders confidence in the Debtor's ability to continue operating while it pursues an asset sale pursuant to section 363 of the Bankruptcy Code (the "**Section 363 Sale**").

29.     Accordingly, the Debtor has an immediate and compelling need for access to the DIP Facility.  Among other things, this access is necessary to continue the operation of its business

in an orderly manner, maintain business relationships with customers and vendors, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtor's going-concern value and, ultimately, conduct successfully a Section 363 Sale. Based on these circumstances, the Debtor requires the funding provided by the proposed DIP Facility to avoid immediate and irreparable harm to its operations, business and estate.

30.     In addition, the Debtor believes alternative financing on more favorable terms is not available. Among other terms, the DIP Facility provides for (i) priority of the DIP Obligations *pari passu* with third-party general unsecured claims without any further or other security or credit support (*e.g.*, no grant of debtor-in-possession liens or allowance of super-priority administrative expenses or administrative expenses), (ii) no commitment or other fees, (iii) contract interest at an annual rate of 5% and default interest at an annual rate of 7.5%, (iv) no limitations on the use of the proceeds of the DIP Obligations other than adherence to the Budget subject to reasonable and customary permitted variances, (v) reasonable case milestones, and (vi) other terms and conditions that are fair and reasonable. Thus, the Debtor submits that the DIP Facility is the best option to finance its liquidity needs for this Chapter 11 Case.

### IV.
### The First Day Pleadings

31.     As noted above, concurrently with and shortly after the filing of this Chapter 11 Case, the Debtor is or will be filing First Day Motions requesting relief necessary or appropriate to effectuate the Debtor's entry into and continued operations under Chapter 11. The Debtor anticipates that the Court will conduct a hearing within a business day or two after the commencement of the Chapter 11 Case during which the Court will consider the First Day Motions.

32.     Generally, the First Day Motions have been designed to meet the immediate goals of (i) establishing procedures for the efficient administration of this Chapter 11 Case; (ii) continuing the Debtor's operations during this Chapter 11 Case with as little disruption and loss of productivity as possible; and (iii) maintaining the confidence and support of the Debtor's key constituencies.  I have reviewed each of the First Day Motions, including the exhibits, attached thereto, and believe the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in this Chapter 11 Case.

33.     A summary of the relief requested and the facts supporting each of the First Day Motions follows.[2]

A.     **Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing the Debtor to Pay (I) All Prepetition Employee Obligations and (II) Prepetition Withholding Obligations, and (B) Authorizing Banks to Honor Related Transfers.**

34.     In order to enable the Debtor to maintain morale during this critical time, retain its current Employees and minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the Debtor seeks authority, in its sole discretion, to pay and honor, as the case may be, the Employee Obligations, up to the Statutory Cap, and the Reimbursable Expenses, including charges incurred on the Fuel Cards.

35.     The Debtor operates in numerous jurisdictions including Alabama, the District of Columbia, Connecticut, Florida, Maine, Missouri, Montana, New Jersey, New York, North Dakota, South Dakota, Texas, Utah and Vermont.  As of the Petition Date, the Debtor's workforce

---

[2] Capitalized terms used in Part IV but not otherwise defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

is comprised of approximately 34 full-time employees, who sell the Debtor's manufactured pharmaceuticals across the United States.[3]

36.     Employees are paid Wages semi-monthly on the fifteenth (15th) and last business day of each month.  Prior to the Petition Date, the average semi-monthly payroll for Wages was approximately $200,000.00.  The Debtor's most recent payroll payment was made on January 31, 2019, for the payroll period from January 16, 2019 through January 31, 2019.  The next payroll payment is scheduled for February 15, 2019.  The Debtor believes that approximately three (3) days' worth of Wages, an amount not to exceed $57,000.00, are accrued and owing to Employees as of the Petition Date.  Additionally, prior to the Petition Date, the Debtor's average semi-monthly obligation for Payroll Taxes was approximately $16,000.00, and the Debtor believes that approximately $4,500.00 of Payroll Taxes are due and owing as of the Petition Date.

37.     Employees begin to accrue PTO as soon as they begin working for the Debtor, with PTO prorated for the year.  PTO accrues at a monthly rate of 1.25 days per month.  Upon seven (7) years of tenure, an Employee will earn an additional five (5) days of PTO.  Employees may roll over up to five (5) days of PTO, and, subject to certain conditions, for Employees who voluntarily resign, the Debtor pays out accrued but unused PTO.  As of the Petition Date, approximately $122,000.00 in PTO is accrued and outstanding.

38.     The Debtor does not provide benefits such as medical, dental and vision insurance, life insurance, disability insurance, retirement plans and other benefits directly to the Employees.  Instead, eligible Employees are offered such benefits through the Debtor's non-Debtor parent.

---

[3]  Shortly before or after the commencement of this Chapter 11 Case, there was or will be a reduction in workforce by approximately 20 employees, which reduced or will reduce the number of full-time employees to 14.  Following the reduction in workforce, such employees will be offered the opportunity to accept severance in exchange for a release. The outstanding Wages and PTO owed to such employees do not exceed the Statutory Cap.  Subject to the Court's approval, such amounts will be paid by the Debtor from funds provided under the proposed debtor-in-possession loan, effectively converting what would be priority claims into general unsecured claims, and therefore, the estate is not harmed by the proposed payments.

39.     The Debtor reimburses Employees for certain job-related expenses.  On average, prior to the Petition Date, the Debtor incurred approximately $75,000.00 per month in Reimbursable Expenses; approximately $80,000.00 is due and owing as of the Petition Date. Additionally, the Debtor provides certain of the Employees with access to the Fuel Cards.  On average, prior to the Petition Date, the Debtor incurred approximately $600.00 per month in connection with charges to the Fuel Cards.  As of the Petition Date, the Debtor estimates that approximately $300.00 will be due and owing with respect to charges made using the Fuel Cards.

**B.      Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Maintenance of its Existing Bank Account and Continued Use of its Existing Business Forms, (II) Waiving Certain Investment and Deposit Guidelines, and (III) Granting Related Relief.**

40.     Prior to the commencement of this Chapter 11 Case, and in the ordinary course of business, the Debtor maintained one (1) Bank Account at Commerce Bank.  The Bank Account is an operating account, which the Debtor uses for day-to-day operations.  The Debtor's transition into chapter 11 will be significantly less disruptive if the Bank Account is maintained following the commencement of the Chapter 11 Case with the same account number.  The Debtor also seeks authority to deposit funds in and withdraw funds from the Bank Account postpetition, including, but not limited to, checks, wire transfers, ACH, electronic funds transfers, and other debits and to treat the Bank Account for all purposes as a debtor-in-possession account.

41.     The Debtor also uses pre-printed check stock with the Debtor's name printed thereon and maintains pre-printed correspondence and business forms such as letterhead, envelopes and promotional materials.  The Debtor will be able to minimize administrative expense and delay if it continues to use its Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's "Debtor-in-Possession" status.

14

C.      **Motion of the Debtor for Entry of an Order Authorizing (I) the Debtor to Pay Prepetition Franchise Taxes, Regulatory Fees and Governmental Rebates in the Ordinary Course of Business and (II) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.**

42.      In connection with the normal operations of its business, the Debtor pays franchise taxes to certain state taxing authorities and regulatory fees and governmental rebates to certain state regulatory authorities, including Medicaid.  Specifically, the Debtor incurs franchise taxes in jurisdictions in which it operates in the ordinary course of business.  Failure to pay the taxes can result in the imposition of penalties and interest or prohibit the Debtor from operating in certain jurisdictions.  The Debtor believes all prepetition Taxes have been paid as of the Petition Date, but, out of an abundance of caution, requests authority to pay for any outstanding Taxes discovered after the Petition Date.

43.      The Debtor manufactures and distributes pharmaceutical drugs in the United States.  As such, the Debtor is required to register with and obtain various state and federal licenses to operate its business as a drug manufacturer and distributor.  A portion of the Regulatory Fees the Debtor incurs consists of the registration and/or renewal fees associated with such licenses.  While most of the Debtor's licenses do not expire until the end of 2019 or early 2020, certain of its licenses will be up for renewal within the next several months.  The Debtor does not believe that there are any outstanding prepetition registration or renewal fees associated with its state and federal licenses as of the Petition Date.  However, the Debtor requests authority to, in its discretion, continue paying registration or renewal fees for its existing licenses, as necessary, as they come due in the ordinary course of business.

44.      The Debtor also participates in the Medicaid Drug Rebate Program to help offset the federal and state costs of its products dispensed to Medicaid patients.  As a participating manufacturer, the Debtor is required to pay applicable states a rebate where its product was sold

to patients under the relevant state's Medicaid plan.  These rebates are generally paid on a quarterly basis and are shared between the states and the Federal government.  As of the Petition Date, the Debtor estimates approximately $20,000.00 of rebates have accrued in connection with the Medicaid Drug Rebate Program.  The Debtor seeks authority to pay the prepetition rebate accrual along with any additional amounts that will accrue and come due following the Petition Date.

45.     By the motion, the Debtor seeks authority to pay prepetition Taxes, Fees and Rebates owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $20,000.00.  In addition, the Debtor also seeks authorization to honor (i) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority as well as (ii) Taxes, Fees and Rebates subsequently determined upon audit to be owed for periods prior to the Petition Date.

**D.     Motion of the Debtor for Entry of Interim and Final Orders Authorizing (I) the Debtor to Pay Certain Prepetition Claims of Materialmen and Warehousemen in the Ordinary Course of Business and (II) Financial Institutions to Honor and Process Related Checks and Transfers.**

46.     As part of its normal business operations, the Debtor relies on certain Lienholders to store the pharmaceutical products and other inventory, for which the Debtor itself does not have appropriate storage facilities.  The Debtor's pharmaceutical products must be stored in licensed, environmentally controlled warehouses, and the Lienholders' warehouse facilities meet these requirements.  The Debtor is wholly dependent on the Lienholders for the successful storage and eventual distribution of the Debtor's pharmaceutical products.  By this motion, the Debtor seeks authority to pay certain prepetition Lien Claims, as, in its business judgment, the Debtor determines is necessary or appropriate to (a) maintain its reliable distribution, storage, and/or administrative support systems, and (b) induce critical service providers to continue to store inventory and provide services up to a maximum amount of $237,000.  The Debtor also requests

all applicable banks and other financial institutions be authorized to process and honor all checks presented for payment of any amounts authorized under this Motion, and to honor all fund transfer requests made by the Debtor related to such charges, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, provided that funds are available in the Debtor's accounts to cover such checks and fund transfers.

47.     Maintaining its existing storage and distribution system with certain of the Lienholders is essential to the success of the Debtor's sale process and its ongoing ordinary course operations throughout this Chapter 11 Case.  Even a short disruption in the services provided by the Lienholders could undermine the Debtor's ability to fulfill the needs of the parties that purchase and distribute its pharmaceutical products and adversely impact such parties' use of the Debtor's products.  I believe the Court should grant this request, and authorize the Debtor to pay certain Lienholders in full and final satisfaction of claims giving rise to potential Liens on the Debtor's property.

**E.      Application of the Debtor for Entry of an Order Authorizing Debtor to Employ and Retain Epiq Corporate Restructuring, LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Local Rule 2002-1(f).**

48.     The Debtor seeks entry of an order authorizing the employment and retention of Epiq Corporate Restructuring, LLC ("**Epiq**") as the "Claims and Noticing Agent" in this Chapter 11 Case.  The Debtor and its advisors obtained and reviewed engagement proposals from three court-approved claims and noticing agents to ensure selection of a Claims and Noticing Agent through a competitive process.

49.     Following that review, and in consideration of the number of anticipated notice parties being in excess of 300, the nature of the Debtor's business, and Epiq's competitive and reasonable rates given their quality of services and expertise, the Debtor selected Epiq to act as the

Debtor's Claims and Noticing Agent.   The retention of Epiq as Claims and Noticing Agent is necessary and in the best interest of the Debtor's estate.   Epiq will relieve the burdens associated with claims and noticing services, allowing the Debtor to devote its attention and resources to maximize value for its stakeholders and facilitate the orderly administration of this Chapter 11 Case.

50.     The Debtor and its advisors reviewed Epiq's Services Agreement, a copy of which is attached as Exhibit B to the Epiq Application, and description of services that Epiq will render in this Chapter 11 Case, Epiq's compensation and other terms of the engagement.   Based on that review, the Debtor believes all parties in interest will benefit as a result of Epiq's experience and cost-effective methods.

## V.
### Conclusion

51.     For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving the Debtor's objectives in this Chapter 11 Case for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions, and I respectfully request that the Court do so.

*[Signature Page Follows.]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 6, 2019

_____
Gregory J. Divis
President of Avadel Specialty
Pharmaceuticals, LLC

# Exhibit A

## Corporate Structure Chart

(Attached)

# Legal Entity Structure

**As of January 1, 2019**

Avadel

**Avadel Pharmaceuticals Plc**

- 100% — **Avadel France Holding SAS**
- 100% — **Avadel Finance Ireland Designated Activity Company**
- 100% — **Avadel Ireland Ltd** — F, M, RD, R, SC
- 100% — **Avadel Investment Company Ltd**
- 100% — **Avadel US Holdings Inc**

**Avadel France Holding SAS**
- 100% — **Avadel Research SAS** — F, RD, R
- 100% — **Avadel Finance Cayman Ltd** — R

**Avadel US Holdings Inc**
- 100% — **Avadel Specialty Pharmaceuticals** — C
- 100% — **Avadel Operations Company, Inc.** — SC
- 100% — **FSC Holding Company** — F, HR, IT, M, RD, R
- 100% — **Avadel Management Corporation**
- 100% — **Avadel Legacy Pharmaceuticals**

**FSC Holding Company**
- 100% — **FSC Therapeutics, LLC**
- 100% — **Avadel Pharmaceuticals (USA), Inc.**
  - 100% — **Avadel Pediatrics Inc.** — C, M

**Avadel Legacy Pharmaceuticals**
- 100% — **Avadel Generics LLC**

## Legal Entity Domicile Key

- Cayman Islands
- France
- Ireland
- United States

## Site Functions Key

- C — Commercial
- F — Finance
- HR — Human Resources
- IT — IT
- M — Management
- RD — R&D
- R — Regulatory
- SC — Supply Chain

## Assets Key

- Employees
- Intellectual Property
- External Sales

Confidential