## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| In re | Chapter 11 |
|---|---|
| Avadel Specialty Pharmaceuticals, LLC,[1] | Case No. 19-10248 (CSS) |
| Debtor. | |

## DEBTOR'S PROPOSED COMBINED DISCLOSURE STATEMENT AND
## CHAPTER 11 PLAN OF LIQUIDATION

**GREENBERG TRAURIG, LLP**
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

Sara Hoffman (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hoffmans@gtlaw.com

**GREENBERG TRAURIG, P.A.**
Paul J. Keenan Jr. (admitted *pro hac vice*)
John R. Dodd (admitted *pro hac vice*)
Reginald Sainvil (admitted *pro hac vice*)
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: keenanp@gtlaw.com
        doddj@gtlaw.com
        sainvilr@gtlaw.com

*Counsel for the Debtor and Debtor in Possession*

Dated: June 10, 2019

---

[1] The business address and the last four (4) digits of the Debtor's federal tax identification number is Avadel Specialty Pharmaceuticals, LLC, 16640 Chesterfield Grove Road, Suite 200, Chesterfield, MO 63005 (8959).

# TABLE OF CONTENTS

**Page**

SECTION 1    INTRODUCTION; IMPORTANT DATES .................................................................1

SECTION 2    DISCLOSURES ..............................................................................................1

2.1    Background and Procedural History .............................................................2

2.2    Summary of Treatment of Claims and Interests Under the Plan ...........................9

2.3    Section-by-Section Summary of the Plan .................................................10

2.4    Tax Consequences of the Plan ...............................................................14

2.5    Requirements for Confirmation of the Plan ...............................................15

2.6    Alternatives to Confirmation of the Plan .................................................17

2.7    Risk Factors ...............................................................................18

SECTION 3    DEFINITIONS AND INTERPRETATION .................................................................19

3.1    Definitions.................................................................................19

3.2    Interpretation: Application of Definitions and Rules of Construction.................26

SECTION 4    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.................................................26

4.1    Administrative Expense Claims.............................................................26

4.2    Accrued Professional Compensation Claims ...............................................27

4.3    Priority Tax Claims.........................................................................27

SECTION 5    CLASSIFICATION OF CLAIMS AND INTERESTS .........................................................28

SECTION 6    TREATMENT OF CLAIMS AND INTERESTS ..............................................................28

6.1    Class 1—Other Priority Claims .............................................................28

6.2    Class 2—Secured Tax Claims ..............................................................29

6.3    Class 3—Other Secured Claims............................................................30

6.4    Class 4—General Unsecured Claims.......................................................30

6.5    Class 5—Subordinated Claims .............................................................30

6.6    Class 6—Interests in Avadel Specialty Pharmaceuticals, LLC ...........................31

SECTION 7    ACCEPTANCE OR REJECTION OF THE PLAN ............................................................31

7.1    Impaired Classes ...........................................................................31

7.2    Acceptance by a Class .....................................................................31

7.3    Claims and Interests Not Entitled to Vote .................................................32

SECTION 8    MEANS FOR IMPLEMENTATION ......................................................................32

8.1     Corporate Action.................................................................................32

8.2     Plan Transactions...............................................................................32

8.3     Effectuating Documents and Further Transactions...................................33

8.4     Authority to Act.................................................................................33

8.5     The Plan Administrator........................................................................33

SECTION 9     DISTRIBUTIONS ..........................................................................35

9.1     Distribution Record Date......................................................................35

9.2     Date of Distributions...........................................................................35

9.3     No Postpetition Interest on Claims.........................................................35

9.4     Disbursing Agent................................................................................36

9.5     Powers of Disbursing Agent..................................................................36

9.6     Surrender of Instruments......................................................................36

9.7     IRS Form W-9....................................................................................36

9.8     Delivery of Distributions......................................................................36

9.9     Manner of Payment.............................................................................37

9.10    Setoffs.............................................................................................37

9.11    Minimum Distributions........................................................................37

9.12    Allocation of Distributions Between Principal and Interest ..........................37

9.13    Distributions Free and Clear.................................................................37

SECTION 10    PROCEDURES FOR DISPUTED CLAIMS ........................................38

10.1    Preservation of Rights/Defenses; Standing to Object.................................38

10.2    Estimation of Claims...........................................................................38

10.3    Distributions Relating to Disputed Claims ...............................................38

10.4    Disallowed Claims..............................................................................38

SECTION 11    EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................39

11.1    General Treatment ..............................................................................39

11.2    Rejection Damages Claims....................................................................39

11.3    Reservation of Rights ..........................................................................39

SECTION 12    CONDITIONS PRECEDENT TO EFFECTIVE DATE ....................................40

12.1    Conditions Precedent...........................................................................40

12.2    Waiver of Conditions...........................................................................40

12.3    Effect of Failure of Conditions ..............................................................40

SECTION 13    EFFECT OF CONFIRMATION .......................................................41

13.1   Vesting of Assets .................................................................................41

13.2   Binding Effect .....................................................................................41

13.3   Compromise and Settlement of Claims, Interests, and Controversies...................41

13.4   Injunction ...........................................................................................41

13.5   Term of Injunctions or Stays................................................................42

13.6   Debtor and Estate Releases..................................................................42

13.7   Releases by Certain Holders of Claims ................................................43

13.8   Exculpation .........................................................................................43

13.9   Retention of Causes of Action/Reservation of Rights ..........................44

SECTION 14   RETENTION OF JURISDICTION .................................................44

SECTION 15   MISCELLANEOUS PROVISIONS ..................................................46

15.1   Payment of Statutory Fees ..................................................................46

15.2   Substantial Consummation ..................................................................46

15.3   Operations Between the Confirmation Date and Effective Date ...........46

15.4   No Retroactive Tax Exemption ...........................................................46

15.5   Determination of Tax Liabilities..........................................................46

15.6   Amendments .......................................................................................47

15.7   Revocation or Withdrawal of the Plan.................................................47

15.8   Savings Clause ....................................................................................47

15.9   Governing Law ...................................................................................48

15.10  Effective Notice .................................................................................48

SECTION 16   CRAMDOWN REQUEST .................................................................48

Appendix A:   Wind-Down Budget
Appendix B:   Liquidation Analysis

## SECTION 1          INTRODUCTION; IMPORTANT DATES

The Debtor[2] hereby proposes this Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.

Please take note of the following important dates relating to the Plan:

- **Deadline for Plan Proponent to provide any supplemental disclosures regarding the Plan (to be filed on the docket and posted on the Voting Agent's website): [August 5], 2019**

- **Ballots from voting creditors must be received by [August 12], 2019, at 5:00 p.m. (prevailing Eastern Time)**

- **Objections to confirmation of the Plan must be filed and served by [August 12], 2019, at 5:00 p.m. (prevailing Eastern Time)**

- **Combined Hearing on adequacy of disclosures and confirmation of the Plan: [August •], 2019, at [        ].m. (prevailing Eastern time)**

## SECTION 2          DISCLOSURES

The information in this Section 2 is provided in order to enable voting creditors to make an informed decision regarding rejection or approval of the Plan.  By order entered [●], 2019, this Disclosure Statement was approved on an interim basis by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code. If you are a voting creditor and believe additional information is necessary for this purpose, please contact counsel for the Debtor[3] as soon as possible to request such information.  The Plan Proponent will make reasonable efforts to comply with requests for additional information, and to make any such information available to all voting creditors by filing a supplement on the docket of the Chapter 11 Case and posting it on the Voting Agent's case website.[4]

**To ensure the timely collection and dissemination of information prior to the Voting Deadline, please make any requests for additional information no later than [July 31], 2019.****

Where appropriate, this Section 2 includes summaries of, or cross-references to, operative provisions of the Plan in Section 3–Section 15.  To the extent of any inconsistency between this Section 2 and any operative provision(s) of the Plan, the operative provision(s) shall control.

---

[2]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 3 below.

[3]    Greenberg Traurig, LLP, MetLife Building, 200 Park Avenue, New York, New York 10166, Attn: Sara A. Hoffman (hoffmans@gtlaw.com).

[4]    https://dm.epiq11.com/case/AVS/info.

1

## 2.1    Background and Procedural History

### 2.1.1    The Debtor and its Business

The Debtor is a pharmaceutical company that was formed in August 2017.  Prior to the commencement of the Chapter 11 Case, the Debtor engaged in the business of marketing, selling and distributing pharmaceutical products with a focus on innovative medicines for chronic urological conditions.  The Debtor's sole commercial product was NOCTIVA™.  NOCTIVA™ is a prescription nasal spray used in adults who wake up two or more times during the night to urinate due to nocturnal polyuria, a condition that causes the kidneys to overproduce urine at night.  In March 2017, the United States Food and Drug Administration (the "**FDA**") approved NOCTIVA™ for the treatment of nocturia due to nocturnal polyuria in adults.  In September 2017, the Debtor was granted an exclusive license to the underlying intellectual property of NOCTIVA™ and the right to commercialize, market, sell and distribute NOCTIVA™ in the United States and Canada.

The Debtor's distribution of NOCTIVA™ consisted of several phases:  (a) manufacturing the raw ingredients for its products (*i.e.*, the active pharmaceutical ingredient (the "**API**")), (b) manufacturing the API into consumable pharmaceuticals, (c) testing the pharmaceuticals by conducting analytical release studies and stability tests, (d) packaging the commercial product, and (e) utilizing a distribution scheme to ensure that the commercial product and samples made their way to end-users.  However, the Debtor did not produce or distribute NOCTIVA™ itself.  Instead, it managed the production and distribution of NOCTIVA™ through third-party manufacturing, distribution and supply agreements.

The Debtor is a limited liability company organized under the laws of the State of Delaware.  The Debtor is a direct and indirect subsidiary of non-debtors Avadel U.S. Holdings, Inc. ("**AUSH**") and Avadel Pharmaceuticals plc ("**Avadel**"), respectively.  Non-debtor Avadel, the Debtor's indirect parent, is formed under the laws of Ireland and is publicly traded on the NASDAQ Global Market under the symbol AVDL.  Avadel is the direct or indirect owner of several subsidiaries that, collectively, underwent an out-of-court restructuring to right-size its headcount, reduce operational expenses, and increase the economic viability and sustainability of its underlying business model.  The Chapter 11 Case is part of the broader restructuring efforts.

### 2.1.2    Debtor's Prepetition Capital Structure

Before the Petition Date, AUSH funded the Debtor's operations and commercialization efforts.  Specifically, AUSH funded $70 million on account of the Initial Payment and the Launch Payment (each, defined below) paid by the Debtor to Serenity Pharmaceuticals, LLC ("**Serenity**") in connection with Serenity granting the Debtor an exclusive license to the underlying intellectual property of NOCTIVA™.  Since September 2017, AUSH provided the Debtor with funds in the aggregate amount of approximately $152 million.  The Debtor has no other secured or unsecured funded indebtedness.

*ACTIVE 43402189v3*

### (1)    **Other Unsecured Debt**

The Debtor estimates that, as of the Petition Date, it had approximately $800,000 in non-contingent, liquidated unsecured debt consisting primarily of accounts payable owed to various third-party vendors and other creditors.

### (2)    **Equity Interests**

The Debtor does not hold equity interest in any other entity.  AUSH owns 100% of the membership interests of the Debtor, and Avadel owns 100% of the equity interests of AUSH.  The equity interests of Avadel are held by individual, private equity, and institutional investors.

## 2.1.3    Events Leading Up to the Chapter 11 Case

The Debtor's success was predicated on its ability to effectively and successfully commercialize and sell NOCTIVA™.  From its launch, however, the overall growth of NOCTIVA™ sales was slower than expected and the Debtor's efforts to increase sales volume were confronted with lower than anticipated market demand, as detailed below.  In addition, sales projections forecasted a substantially longer period of operating losses than the Debtor had originally assumed.  As a result, the Debtor experienced substantial losses since its inception and, as of the Petition Date, had an accumulated deficit, due in part to costs relating to underachieving sales, unanticipated competition, and certain supply agreements.

Shortly after its formation, on September 1, 2017, the Debtor entered into an exclusive license agreement with Serenity (the "**License Agreement**") under which the Debtor was granted the exclusive right to develop, market, and sell NOCTIVA™ in the United States and Canada.  Under the terms of the License Agreement and in consideration of the licenses granted to the Debtor to enable the Debtor to commercialize NOCTIVA™, the Debtor was obligated to make two one-time payments totaling $70 million to Serenity:  the first, an upfront payment of $50 million (the "**Initial Payment**") due on the effective date of the License Agreement, and the second, a $20 million payment (the "**Launch Payment**") due on the earlier of (i) 30 days after NOCTIVA™ was launched and available for commercial sale to patients and (ii) June 30, 2018.  In addition to such payments, under the License Agreement, the Debtor was required to pay Serenity various commercialization milestone payments as well as royalties from sales.

As noted in Section 2.1.1 above, the Debtor did not produce or distribute NOCTIVA™ itself.  Instead, it managed the production and distribution of NOCTIVA™ through third-party manufacturing, distribution and supply agreements.    The Debtor's primary third-party manufacturer of NOCTIVA™ was Renaissance Lakewood, LLC f/k/a DPT Lakewood, LLC ("**Renaissance**").    Serenity had a prior relationship with Renaissance and assigned its manufacturing and supply agreement with Renaissance to the Debtor in connection with the License Agreement.  Under the manufacturing and supply agreement with Renaissance, the Debtor was required to purchase a minimum of 400,000 units of NOCTIVA™ each year, regardless of need.  In the event the Debtor failed to purchase the minimum number of units in any calendar year, the Debtor was nevertheless required to pay the shortfall to Renaissance.  As of the Petition Date, the Debtor has spent approximately $4.8 million on NOCTIVA™ inventory,

3

and expected to spend over $3.5 million annually under the manufacturing and supply agreement with Renaissance.

The Debtor experienced several market challenges in its efforts to commercialize NOCTIVA™. First, health care professionals were unwilling to try or adopt NOCTIVA™ as a treatment option for patients suffering from nocturia due to nocturnal polyuria. Instead, they would almost exclusively treat patients with other agents that target conditions such as overactive bladder and benign prostatic hyperplasia (*i.e.*, enlarged prostate). Second, but related, health care professionals were hesitant to try or adopt NOCTIVA™ for their patients due to underlying concerns with regard to the potential risks of a serious side effect associated with the active ingredient in NOCTIVA™ (desmopressin acetate) based on prior experience with older formulations having greater amounts of the same active ingredient. Third, health care professionals were unwilling to broadly adopt NOCTIVA™ due to certain serum sodium monitoring requirements that are not in the ordinary course for physicians treating patients suffering from nocturia due to nocturnal polyuria. Fourth, within six months of NOCTIVA™'s launch, Ferring launched its competing Nocdurna product, which is the subject of a pending patent infringement action (see Section 2.1.8 below). Fifth, the launch of the Nocdurna product interfered with NOCTIVA™'s formulary placement with insurance providers. Lastly, given the evolution of patient benefit designs and restrictions managed care companies have placed on NOCTIVA™, during the first approximately nine months of commercialization, over 55% of all prescriptions were dispensed for free resulting in no corresponding positive gross margin. Furthermore, when combined with the additional qualified and eligible financial assistance provided for insured beneficiaries with a covered benefit for NOCTIVA™, the resulting gross margin was substantially lower than originally assumed.

In November 2018, the Debtor commenced a process to find a co-promoter for NOCTIVA™, but the process yielded no material interest. After a strategic review, the Debtor determined that it was no longer economically viable to continue promoting NOCTIVA™ and decided to exit its business.

Accordingly, on February 6, 2019 (the "**Petition Date**"), the Debtor commenced the Chapter 11 Case. In commencing the Chapter 11 Case, the Debtor intended to (a) sell its assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for proposals for a sale of all or any combination of its assets, (b) liquidate any remaining assets, and (c) wind down its operations in an orderly manner.

### 2.1.4    "First-Day" Relief

On the Petition Date, the Debtor filed a number of motions and applications seeking customary relief intended to facilitate a smooth transition for the Debtor into the Chapter 11 Case and to minimize disruptions to the Debtor's business operations (the "**First-Day Motions**"), namely:

- a motion for authority to honor prepetition employee wage and withholding obligations [D.I. 4];

- a motion for authority to pay prepetition franchise taxes, regulatory fees and governmental rebates in the ordinary course of business [D.I. 5];

- a motion for authority to pay certain prepetition claims of materialmen and warehousemen in the ordinary course of business [D.I. 6];

- a motion for approval of debtor-in-possession ("**DIP**") financing from AUSH [D.I. 7];

- an application to retain Epiq Corporate Restructuring, LLC ("**Epiq**") as the Debtor's official claims and noticing agent [D.I. 8]; and

- a motion for authority to continue using the Debtor's prepetition bank accounts and business forms and to waive certain investment and deposit guidelines [D.I. 9].

Following a hearing on February 8, 2019, the Bankruptcy Court granted the relief requested in the First-Day Motions on an interim or final basis, as applicable [D.I. 33-38].

### 2.1.5   "Second-Day" Relief

On or shortly after the Petition Date, the Debtor also filed a number of "second-day" motions and applications for retention of professionals and for sale-related relief, including:

- a motion to establish interim procedures for compensation and reimbursement of expenses of professionals [D.I. 25], which was granted by the Bankruptcy Court without objection [D.I. 85];

- a motion for approval of (i) bidding procedures in connection with the sale of the Debtor's assets, and (ii) the sale to the successful bidder (the "**Sale Motion**") [D.I. 26];

- an application to retain MCA Financial Group, Ltd. to act as the Debtor's financial advisor [D.I. 47], which was granted by the Bankruptcy Court without objection [D.I. 86];

- an application to retain Cassel Salpeter & Co., LLC to act as the Debtor's investment banker [D.I. 48], which was granted by the Bankruptcy Court without objection [D.I. 89];

- an application to retain Epiq to act as the Debtor's administrative agent [D.I. 49], which was granted by the Bankruptcy Court without objection [D.I. 99]; and

- an application to retain Greenberg Traurig, LLP as counsel for the Debtor [D.I. 50], which was granted by the Bankruptcy Court without objection [D.I. 87].

*ACTIVE 43402189v3*

### 2.1.6    No Formation of a Creditors' Committee

On February 20, 2019, the Office of the United States Trustee (the "**U.S. Trustee**") filed a statement indicating an insufficient response to the U.S. Trustee's communication regarding interest to serve on an official committee of unsecured creditors and, therefore, no such committee was appointed pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 58].

### 2.1.7    Sale of Certain of Debtor's Assets

As set forth in the Sale Motion, the Debtor sought to sell its assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for proposals for a sale of all or any combination of its assets, including, but not limited to, a sale (i) of all or substantially all assets, (ii) of the new drug application for NOCTIVA™ and all inventory, (iii) for only the new drug application for NOCTIVA™, or (iv) for only the NOCTIVA™ inventory.

On March 13, 2019, the Bankruptcy Court entered an order, among other things, (i) approving certain procedures relating to the sale of the Debtor's assets; (ii) scheduling a hearing on April 10, 2019 to consider approval of a proposed sale of the Debtor's assets (the "**Sale Hearing**"); and (iii) approving the form and manner of notice of any auction for the Debtor's assets and the Sale Hearing (the "**Bid Procedures Order**") [D.I. 100].  The Bid Procedures Order fixed April 1, 2019 (the "**Bid Deadline**") as the deadline for the submission of bids for the Debtor's assets.  On the Bid Deadline, the Debtor received two (2) offers for its assets.  In accordance with the Bid Procedures Order, on April 3, 2019, the Debtor conducted an auction for its assets among the two bidders.  At the conclusion of the auction, the Debtor determined that Roivant Sciences GmbH ("**Roivant**" or the "**Purchaser**") provided the highest and best offer for certain of the Debtor's assets.

As set forth in the Asset Purchase Agreement, in exchange for $250,000.00 (the "**Sale Proceeds**"), Roivant was to receive, among other things, (i) raw materials, supplies, components, work-in-process, finished goods, samples, packaging materials, and other NOCTIVA™ inventories; (ii) marketing materials, research data, customer and sales information, sales training materials, advertising and display materials; (iii) internet domain names and websites owned by the Debtor related to NOCTIVA™; (iv) all regulatory approvals for NOCTIVA™ and related documentation; and (v) all books and records related to NOCTIVA™ inventories.[5]  The Asset Purchase Agreement does not provide for any of the Debtor's executory contracts or unexpired leases to be assumed and assigned to Roivant in connection with the sale nor does it provide for the transfer of any Causes of Action under Chapter 5 of the Bankruptcy Code (e.g., for recovery of preferential payments from creditors).

Prior to the filing of the Asset Purchase Agreement, several parties objected to the proposed sale to the extent it involved the assumption and assignment of certain agreements [D.I. 118], the transfer of certain intellectual property [D.I. 128], or otherwise interfered with certain litigation [D.I. 125]; these objections were ultimately resolved at or prior to the Sale Hearing.

---

[5]    The description of the assets transferred to the Purchaser as part of the sale is a summary.  A complete list of the transferred assets is attached as Schedule 1.1 to the Asset Purchase Agreement, a copy of which is attached to the Sale Order.

On April 8, 2019, Serenity filed an objection to the Sale Motion (the "**Serenity Sale Objection**) [D.I. 120], which primarily challenged the Debtor's ability to sell the regulatory rights related to NOCTIVA™ without also assuming and assigning certain agreements, including the License Agreement.

At the conclusion of the Sale Hearing, the Bankruptcy Court overruled the Serenity Sale Objection and approved the proposed sale to Roivant, subject to the submission of a revised proposed order.  On April 15, 2019, the Bankruptcy Court entered the Sale Order [D.I. 144].

Pursuant to paragraph 27 of the Sale Order, the effectiveness of the Sale Order was stayed for seven (7) days.  Shortly following the entry of the Sale Order, Serenity filed an emergency motion seeking a stay of the Sale Order beyond the provided seven (7) days, pending Serenity's "forthcoming" appeal of the Sale Order (the "**Motion for Stay Pending Appeal**") [D.I. 145].  On April 18, 2019, the Bankruptcy Court held a hearing to consider the Motion for Stay Pending Appeal.  Following the conclusion of the hearing, the Bankruptcy Court entered an order [D.I. 158] denying the Motion for Stay Pending Appeal, but extending the stay of the Sale Order through April 24, 2019 to allow Serenity the opportunity to seek the same relief before the United States District Court for the District of Delaware.  Serenity did not ultimately pursue such relief before the United States District Court for the District of Delaware prior to April 24, 2019, and the sale closed on April 26, 2019.

### 2.1.8    Ferring Stay Relief Motion and Settlement

Ferring Pharmaceuticals, Inc., Ferring B.V., and Ferring International Center S.A. (collectively, "**Ferring**") has been engaged in the business of researching, developing and commercializing desmopressin drugs since the 1970s.  In November 2018, Ferring launched the sale of NOCDURNA®, an FDA-approved orodispersible tablet used to treat nocturia due to nocturnal polyuria in adults.  The active ingredient in both NOCDURNA® and NOCTIVA™ is desmopressin.

On April 28, 2017, Ferring commenced an action (as amended, the "**District Court Litigation**") in the United States District Court for the District of Delaware against non-debtors Serenity, Reprise Biopharmaceutics, LLC ("**Reprise**") and Allergan, Inc. ("**Allergan**"), seeking a declaratory judgment of patent invalidity, unenforceability and non-infringement with respect to certain patents.  On December 20, 2017, the case was transferred to the United States District Court for the Southern District of New York.  Allergan was then voluntarily dismissed, without prejudice, from the District Court Litigation.  Thereafter, Serenity and Reprise, along with the Debtor, filed their answer and asserted various counterclaims, including patent infringement and willful patent infringement and moved for declaratory judgment of no trademark infringement. On July 19, 2019, Ferring answered the counterclaims of the Debtor, Serenity and Reprise and asserted counterclaims in reply against the Debtor.  Prior to the commencement of a trial on the claims and counterclaims of the parties, the Debtor commenced the Chapter 11 Case, enacting the automatic stay with respect to the District Court Litigation, as it relates to the Debtor.

On February 15, 2019, Ferring filed a motion (the "**Stay Relief Motion**") [D.I. 54] seeking relief from the automatic stay in order to continue prosecuting the District Court Litigation.  On March 1, 2019, the Debtor filed an objection to the Stay Relief Motion [D.I. 65].

7

On April 8, 2019, Ferring filed a reply in support of the Stay Relief Motion [D.I. 122].   The parties agreed to adjourn the Stay Relief Motion to allow the Debtor the opportunity to focus on its asset sale.

Following the entry of the Sale Order, the Debtor and Ferring reached an agreement in principle to resolve the Stay Relief Motion (the "**Ferring Settlement**").   The terms of the Ferring Settlement were read into the record of an omnibus hearing held before the Bankruptcy Court on May 14, 2019.   Under the Ferring Settlement:

(i)     The Debtor agrees to file a plan of liquidation on or before June 10, 2019 that provides for the rejection of the License Agreement with Serenity;

(ii)    The Debtor agrees not to pursue any claims against Ferring in connection with the District Court Litigation;

(iii)   The Debtor agrees to include in its plan of liquidation a release of its claims against Ferring in connection with the District Court Litigation;

(iv)    The Debtor agrees to dismiss, with prejudice, its claims (including, but not limited to, its counterclaims) against Ferring in the District Court Litigation;

(v)     Ferring agrees to promptly dismiss, with prejudice, any and all claims (including, but not limited to, its counterclaims in reply) against the Debtor in connection with the District Court Litigation, with such dismissal to be effective concurrent with the effective date of the Debtor's dismissal of its claims against Ferring in the District Court Litigation;

(vi)    As of May 14, 2019, Ferring agrees not to pursue additional discovery from the Debtor in connection with the District Court Litigation while the Debtor seeks approval of its plan of liquidation and while the parties are in the process of dismissing their claims (including, but not limited to, their counterclaims) against each other;

(vii)   Ferring agrees not to pursue discovery from the Debtor in connection with the District Court Litigation once the parties' claims against each other are dismissed;

(viii)  Ferring agrees to adjourn the Stay Relief Motion while the Debtor seeks approval of its plan of liquidation and solicits acceptance of such plan;

(ix)    Ferring agrees to dismiss the Stay Relief Motion once any plan of liquidation becomes effective; and

(x)     The Debtor agrees to state the terms of the Ferring Settlement and Ferring agrees to state its confirmation of such terms on the record at the May 14, 2019 omnibus hearing before the Bankruptcy Court, which the parties so did.

For the avoidance of doubt, in the event the Bankruptcy Court does not approve the Debtor's release of claims against Ferring (or in the event any related decision by the Bankruptcy Court is overturned on appeal), or the claims between the Debtor and Ferring are not dismissed with prejudice in the District Court Litigation (for reasons entirely uncontrollable by either party), the Ferring Settlement shall be null and void.

### 2.1.9    The Plan Process

After the Ferring Settlement was reached, the Debtor worked toward preparing an orderly wind-down of the Chapter 11 Case and the proposal of a liquidating Chapter 11 plan.  To this end, the Debtor has sought and obtained entry of an order [D.I. 191] establishing (i) **July 2, 2019**, as the general bar date (i.e., deadline) for filing prepetition claims, including claims asserting administrative priority under section 503(b)(9) of the Bankruptcy Code for goods delivered within 20 calendar days prepetition; (ii) **August 7, 2019**, as the governmental bar date; and (iii) **July 2, 2019**, as the bar date for filing requests for payment of Administrative Expense Claims (other than Accrued Professional Compensation Claims) arising on or before May 29, 2019.

To streamline the process and save costs, the Debtor decided the best course of action was to file a combined plan and disclosure statement, and to seek preliminary approval of the disclosures and the scheduling of a combined, final hearing on plan confirmation and the adequacy of the disclosures.

### 2.1.10   Assets Available for Distribution

As of the date hereof, the Debtor's Remaining Assets consist primarily of $250,000.00 Cash on hand resulting from the sale of certain of its Assets to the Purchaser.

### 2.2    Summary of Treatment of Claims and Interests Under the Plan

The table below summarizes the classification and treatment of the pre-petition Claims and Interests under the Plan, and provides a good-faith estimate of the amount of Allowed Claims in each Class and the recovery to creditors in certain Classes.  Estimated Claim Amounts are based on the Debtor's Schedules, and may not reflect all Claims filed (or that may be filed) by the applicable bar date.   Estimated percentage recoveries are based on a number of assumptions, including with respect to the amount of Allowed Administrative Expense Claims and Plan Expenses in the Chapter 11 Case.  ***Actual percentage recoveries may differ from what is set forth in the following table, and such difference may be material.***

| Class of Claims or Interests | Estimated Amount of Allowed Claims | Treatment / Voting Status | Estimated Recovery |
|---|---|---|---|
| 1<br>Other Priority Claims | None | **Unimpaired**<br>Deemed to Accept | 100% |
| 2<br>Secured Tax Claims | None | **Unimpaired**<br>Deemed to Accept | 100% |

9

| Class of Claims or Interests | Estimated Amount of Allowed Claims | Treatment / Voting Status | Estimated Recovery |
|---|---|---|---|
| 3<br>Other Secured Claims | None | **Unimpaired**<br>Deemed to Accept | 100% |
| 4<br>General Unsecured Claims[6] | $1,491,799 | **Impaired**<br>Entitled to Vote | 16.76% |
| 5<br>Subordinated Claims | Unknown | **Impaired**<br>Deemed to Reject | None |
| 6<br>Interests in Avadel Specialty Pharmaceuticals, LLC | n/a | **Impaired**<br>Deemed to Reject | None |

### 2.3    Section-by-Section Summary of the Plan

This Section 2.3 summarizes Section 3–Section 15 and should be read in conjunction with those sections to aid in their comprehension. However, the provisions of Section 3–Section 15 are the sole and exclusive source of rights and obligations under the Plan; thus, to the extent of any inconsistency between the descriptions in this Section 2.3 and the actual provisions of Section 3–Section 15, the latter shall control.

#### 2.3.1    Definitions and Interpretation

Section 3.1 contains definitions of the capitalized terms that are used in the operative provisions of the Plan, but which are not otherwise defined herein. The definitions of "Exculpated Parties," "Released Parties," and "Releasing Parties" are particularly important to an understanding of the Plan's exculpation and release provisions.

Section 3.2 provides certain principles that govern interpretation of the Plan, including particularly that (i) non-capitalized terms that are defined in the Bankruptcy Code (e.g., "affiliate," "entity," "insider," "person"), have the same meanings for purposes of this Plan, (ii) the terms "includes" and "including" are not limiting (so, "including X" should be read as "including, but not limited to, X"), and (iii) the term "or" is not exclusive (so, "A or B" should be read as "A or B (or both)").

#### 2.3.2    Administrative Expense and Priority Claims

The Bankruptcy Code generally requires that administrative and priority claims be paid in full on the Effective Date. Thus, Section 4 provides for this, subject to limited variations such as by agreement of affected holders of Allowed Administrative Expense Claims or Priority Claims.

---

[6] DIP Claims are *pari passu* with General Unsecured Claims pursuant to the Final DIP Order, but are not entitled to vote on the Plan.

*ACTIVE 43402189v3*

Section 4.2 provides rules applicable to Accrued Professional Compensation Claims, which are a subset of Administrative Expense Claims, including (i) a deadline for filing final fee applications with the Bankruptcy Court, and (ii) limitation of payments to the Professionals to the amounts set forth in the Wind-Down Budget.

### 2.3.3    Classification of Claims and Interests

In accordance with Bankruptcy Code section 1122, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class.  Section 5 of the Plan provides the classifications, each Class's Impaired or Unimpaired status, and each Class's voting status.  (This information is also reflected in the table in Section 2.2 above.)  As explained in Section 3.1.14 (definition of "Class"), Classes are organized by number for type of Claim or Interest (1-6).

### 2.3.4    Treatment of Claims and Interests

Section 6 provides the treatment of Claims and Interests in the respective Classes. Allowed Other Priority Claims (§ 3.1.37), Secured Tax Claims (§ 3.1.62), and Other Secured Claims (§ 3.1.38), if any, will be satisfied in full in the manner provided in Sections 6.1, 6.2, and 6.3.

Section 6.4 provides that the net assets available for distribution to general unsecured creditors will fund *pro rata* distributions on Allowed General Unsecured Claims (§ 3.1.31).

Other Classes of Claims and Interests will receive no Distributions under the Plan.

### 2.3.5    Acceptance or Rejection of the Plan

Section 7 provides how acceptance or rejection of the Plan by each Class will be determined, and which Class(es) are entitled to vote.

Holders of General Unsecured Claims (§ 3.1.31) as of the Voting Record Date (§ 3.1.67) are the only creditors entitled to vote to accept or reject the Plan.  Holders of all other Claims and Interests are either deemed to accept the Plan or deemed to reject the Plan.

A voting Class will be deemed to accept the Plan if *either* (a) the holders of Claims in that Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that vote in such Class vote to accept the Plan *or* (b) no votes are received by the Voting Agent from holders of Claims in that Class.  **\*\*Therefore, if you are entitled to vote on the Plan, but fail to do so, your Class may be deemed to accept the Plan.\*\***

A creditor is not entitled to vote if, as of the Voting Record Date, its Claim (a) has been disallowed, or (b) is a Disputed Claim (§ 3.1.22), <u>provided</u> that if a Claim has been disallowed in part (or a pending objection seeks disallowance of such Claim only in part) as of the Voting Record Date, the Allowed (or undisputed) portion of the Claim may be voted.

### 2.3.6   Means for Implementation of the Plan

Section 8 provides for the appointment of a Plan Administrator, which will be vested with all Assets of the Debtor's Estate as of the Effective Date (§ 3.1.25), and will carry out the provisions of the Plan with respect to the reconciliation of Claims and Distributions to creditors. The rights, powers, and duties of the Plan Administrator are solely as set forth in the Plan, including in Section 8.5.1.

Section 8 also provides for an efficient means to immediately terminate the existence of the Debtor and to close the Chapter 11 Case, when appropriate.

### 2.3.7   Distributions

Section 9 provides general procedures concerning Distributions under the Plan.  Other procedures in Section 9 include: (i) disallowance of post-petition interest, (ii) treatment of undeliverable Distributions, (iii) preservation of the Debtor's setoff rights, and (iv) minimum distribution amounts and disposition of any residual Cash.  The Plan Proponent believes that these procedures are reasonable, customary, and in the best interests of the Debtor's creditors.

### 2.3.8   Procedures for Disputed Claims

Section 10 provides customary procedures relating to the allowance and estimation of, and holdback of Distributions relating to, Disputed Claims.  On the Effective Date of the Plan, the Plan Administrator will be vested with all of the Debtor's rights and defenses with respect to any Claims, and will have standing to object to, or seek to estimate, any Claims.

### 2.3.9   Executory Contracts and Unexpired Leases

Section 11 provides for automatic rejection on the Effective Date of all executory contracts and unexpired leases, except for those previously assumed, designated to be assumed in the Plan, or subject to a separate assumption motion, if any.  Section 11 also provides for the deadline for any rejection damage claims resulting from such deemed rejection as of the Effective Date.

### 2.3.10   Conditions Precedent to Effective Date

The occurrence of the Effective Date of the Plan is subject to the satisfaction or waiver of the specific conditions listed in Section 12, including that the Plan has been accepted by the voting Class of General Unsecured Claims.  The Plan Proponent believes that these conditions are reasonable, customary, and in the best interests of the Debtor's creditors.

### 2.3.11   Effect of Confirmation

Section 13 is intended to provide the broadest permissible extent of finality and binding effect of confirmation of the Plan, and the occurrence of the Effective Date, on all creditors, Interest holders and other affected parties.  The binding effect of the Plan expressly covers all such persons and entities regardless of whether any such holder of a Claim or Interest has voted, failed to vote, failed to opt out of any proposed releases and injunctions provided in the Plan, or

12

has any right to a Distribution. **The due process requirements of pursuing confirmation of the Plan require actual mailed notice to affected parties, and as such, the failure to act may be taken as consent, in particular as to the releases and injunctions provided under the Plan.**

The Plan is a liquidating plan and, as provided in section 1141(d)(3) of the Bankruptcy Code, the confirmation of a plan does not formally discharge a debtor if the plan provides for the liquidation of all or substantially all of the property of the estate. However, the releases and injunctions provided under the Plan, when coupled with the permanent dissolution of the Debtor, have an effect that is similar in some respects to a full discharge. Subsections of Section 13 not elaborated upon below are self-explanatory or addressed elsewhere.

### (1)    Section 13.4 – Injunction

The injunction provisions of Section 13.4 are intended to be as broad as legally permissible. The purpose of such injunctions is entirely integrated with the express purpose of the Plan: to provide a global and final resolution of all Claims and potential Claims as among all creditors, parties and parties in interest on all things relating to the Debtor. Claims against parties subject to the protections of the Plan's injunctions could give rise to additional Claims for advancement, indemnification, contribution, or reimbursement by the Debtor or its Estate, among other things. For this reason, Claims of any and all natures were required to be asserted prior to the applicable bar date, or generally in or in connection with the Debtor's Chapter 11 Case. Claims or potential Claims not timely made in this manner must be enjoined to avoid frustrating the express purpose of the Plan in identifying all Claims and potential Claims, and providing a final, full, and global resolution of such Claims.

### (2)    Section 13.6 – Debtor and Estate Releases

Section 13.6 provides for broad releases by the Debtor, on behalf of its Estate, of any Causes of Action against the Released Parties (§ 3.1.53), which include (i) AUSH, (ii) AUSH's directors, officers, principals, agents, affiliates (other than the Debtor), employees, and professionals, and (iii) subject to Ferring's dismissal of any and all claims or counterclaims against the Debtor in the District Court Action, Ferring. These releases exclude Causes of Action (i) arising out of or relating to any crime, willful misconduct, or gross negligence; or (ii) arising out of the Ferring Settlement, the Asset Purchase Agreement, the Sale Order, or any Plan Transaction. The Plan Proponent believes these releases are fully warranted in order to achieve a full, global and final resolution of all Causes of Action and potential Causes of Action that the Debtor may have. In addition, the Plan Proponent does not believe that there are any such Causes of Action against any Released Party that are viable in any event (subject to Ferring's dismissal of any and all claims or counterclaims against the Debtor in the District Court Action).

### (3)    Section 13.7 – Releases by Certain Holders of Claims

Section 13.7 provides for broad releases of the Released Parties (§ 3.1.53) from any Causes of Action held by the Releasing Parties (§ 3.1.54), which include (i) AUSH, and (ii) creditors who either (a) do not "opt out" of providing the releases or (b) do not object to

13

providing the releases.  These releases exclude Causes of Action (i) arising out of or relating to any crime, willful misconduct, or gross negligence; or (ii) arising out of the Ferring Settlement, the Asset Purchase Agreement, the Sale Order, or any Plan Transaction.  The Plan Proponent believes that these releases are consensual, in that a creditor's failure to "opt out" or to object to the Plan will be deemed that creditor's consent to provide the releases.

### (4)    Section 13.8 – Exculpation

Section 13.8 provides that the Debtor and those acting on its behalf in preparing and prosecuting the Chapter 11 Case shall have no liability for any prepetition or postpetition act taken or omitted to be taken in connection with a broad scope of actions in prosecuting the case. This exculpation provision shall have no effect on the liability of any entity that results from a crime, willful misconduct, or gross negligence.

### 2.3.12  Retention of Jurisdiction

Section 14 is largely self-explanatory.  The Plan expressly provides for broad retention of the Bankruptcy Court's jurisdiction in order to allow efficient recourse to the Bankruptcy Court for disputes arising after the Effective Date that bear an appropriate nexus to the Debtor and the Chapter 11 Case.

### 2.3.13  Miscellaneous Provisions

Overall, the provisions of Section 15 are self-explanatory.  Among others, Section 15.1 provides for the payment of statutory fees and interest, if any, due to the U.S. Trustee in connection with the Chapter 11 Case; Section 15.3 allows for the continued operations of the Debtor during the period from the Confirmation Date through the Effective Date; and Section 15.6 outlines the method by which this Plan and related documents may be amended.

### 2.4    Tax Consequences of the Plan

Confirmation of a Chapter 11 plan can have a number of tax implications for the debtor and for holders of claims against and interests in the debtor, including discharge/cancellation of indebtedness and capital gains/losses.  The tax consequences to holders of claims or interests may vary based upon the individual circumstances of each holder.  Moreover, the tax consequences of certain aspects of a plan may be uncertain due to, in some cases, the lack of applicable legal precedent and the possibility of changes in the law.

Given the relative size of the Debtor's Estate and the nature of the Claims against and Interests in the Debtor, the Plan Proponent has not undertaken an analysis of the tax consequences of the Plan upon the Debtor or upon holders of Claims and Interests.  In addition, no ruling has been applied for or obtained from the Internal Revenue Service or any State or local taxing authority, and no opinion of counsel has been requested or obtained by the Plan Proponent with respect to the tax aspects of the Plan.  Accordingly, there can be no assurance that the Internal Revenue Service or any State or local taxing authority will not challenge any position taken by a holder of a Claim or Interest as to the tax consequences of the Plan, or that such a challenge, if asserted, would not be upheld.

14

**\*\*Please note that the foregoing discussion does <u>not</u> constitute tax advice or a tax opinion concerning the Plan.  Holders of Claims and Interests are <u>strongly</u> <u>urged</u> to consult with their own tax advisors regarding the tax consequences of the Plan.\*\***

### 2.5    Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Combined Hearing that the following requirements for confirmation set forth in Bankruptcy Code section 1129, among others, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan Proponent has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- At least one Impaired Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- The Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor other than what is provided for in the Plan (the "**Feasibility Test**").

- Each holder of a Claim or Interest that is Impaired by the Plan either (a) has accepted the Plan or (b) will receive or retain on account of such Claim(s) or Interest(s) property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

- The Plan does not discriminate unfairly against, and is fair and equitable with respect to, non-accepting Classes (the "**Cramdown Test**").

The Plan Proponent has complied with all of the requirements of Chapter 11 of the Bankruptcy Code, and the Plan has been proposed and submitted to the Bankruptcy Court in good faith.  The Plan Proponent believes that the Feasibility Test, the Best Interests Test, and the Cramdown Test are satisfied for the reasons discussed further below.  Thus, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code.

### 2.5.1    Feasibility Test

The Plan Proponent believes the Plan satisfies the Feasibility Test because it provides for the satisfaction of all administrative and priority claims on the Effective Date, and for the retention by the Plan Administrator of sufficient Cash to wind down the Chapter 11 Case.  As a result, no additional liquidation or financial reorganization of the Debtor will be necessary.

### 2.5.2    Best Interests Test

As noted above, the Best Interests Test requires that any creditor or Interest holder who does not accept the Plan recover at least as much under the Plan as they would have recovered in a hypothetical Chapter 7 liquidation of the Debtor.

To calculate the probable distribution to creditors and Interest holders in Chapter 7, the Bankruptcy Court must first determine the aggregate liquidation value of the Debtor's assets. This value would then be reduced by, first, the claims of any secured creditors to the extent of the value of their collateral and, second, by the administrative expenses and costs of *both* the Chapter 7 case and the Chapter 11 Case. Costs of liquidation under Chapter 7 would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the Debtor in its Chapter 11 Case (such as compensation of professionals, and claims arising from the Debtor's operations) that are allowed in the Chapter 7 case, and, potentially, litigation costs.

After determining the net asset value (if any) available for distribution to creditors and Interest holders, the Bankruptcy Court would then determine the probable distribution (if any) to general unsecured creditors and Interest holders, taking into account their respective priorities under applicable law and any inter-creditor subordination agreement(s). If the probable distribution to a creditor or Interest holder in the hypothetical Chapter 7 liquidation scenario is greater than they would receive under the Plan, then the Plan is deemed not in the best interests of that creditor or Interest holder. And if the probable Chapter 7 distribution is equal to or less than what the Plan provides, the Best Interests Test is satisfied.

As illustrated in the Liquidation Analysis attached as Appendix B, Interest holders would receive no distribution in Chapter 7, and holders of Claims in the voting Class will receive the same or better recovery under the Plan as they would in Chapter 7. Accordingly, the Plan Proponent believes that the Best Interests Test will be satisfied as to any creditors and Interest holders who do not accept the Plan.

### 2.5.3    Cramdown Test

The Plan may be confirmed even if it has not been accepted by all Impaired Classes, so long as at least one Impaired Class has accepted it (without taking into account acceptances by insiders), and (ii) the Cramdown Test is satisfied as to the non-accepting Classes. As noted above, the Cramdown Test is satisfied if the Plan does not "discriminate unfairly" against, and is "fair and equitable" with respect to, each Impaired, non-accepting Class.

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. And a plan is "fair and equitable" as to a class of unsecured claims or interests, so long as the holder of any claim or interest in a junior class will not receive or retain any property under the plan on account of such junior claim or interest.

In view of the deemed rejection of the Plan by holders of Subordinated Claims and Interests in the Debtor, the Plan Proponent will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. The Plan does not discriminate unfairly against

16

any of these Claims or Interests because there are no other Classes of Claims or Interests of equal rank receiving alternative treatment. And the Plan is fair and equitable as to these Claims and Interests because holders of Claims in junior Classes will not receive or retain any property under the Plan and there are no Classes of Interests junior in rank that will receive or retain any property under the Plan.

The Plan Proponent further reserves the right to seek a "cramdown" confirmation of the Plan with respect to the voting Class in the event it votes to reject the Plan. In the event it becomes necessary to "cram down" the Plan over the rejection of the voting Class, the Plan Proponent will demonstrate at the Combined Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Class.

### 2.6    Alternatives to Confirmation of the Plan

If the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives to the Plan would be (a) formulation of one or more alternative Chapter 11 plans, (b) conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Case. As discussed below, the Plan Proponent does not believe that any of these alternatives, even if viable, would afford holders of General Unsecured Claims a greater recovery on their Claims than what is provided by the Plan.

### 2.6.1    Alternative Chapter 11 Plan(s)

If the requisite acceptances are not received or if the Plan is not confirmed, any other party in interest could attempt to formulate and propose one or more different Chapter 11 plans. However, even assuming an alternative plan structure would be viable, pursuit of confirmation of an alternative plan would necessarily add delay and cost to the Chapter 11 Case, which would erode the limited assets available for distribution to creditors. For these reasons, among others, the Plan Proponent believes that the Plan enables creditors to realize the greatest possible value under the circumstances, and has the greatest chance to be confirmed and consummated.

### 2.6.2    Conversion to Chapter 7

If the Plan is not confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis, the Plan Proponent believes the Plan provides a better outcome for holders of General Unsecured Claims than a Chapter 7 liquidation would provide.

### 2.6.3    Dismissal of the Chapter 11 Case

If the Plan is not confirmed, the Chapter 11 Case could also be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtor and its assets, likely to the detriment of other creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Case is dismissed, it is unlikely that dismissal would result in a ratable distribution of

17

the Debtor's assets among creditors as provided in the Plan.  Thus, the vast majority of creditors could expect to receive less in the dismissal scenario than they would receive under the Plan.

### 2.7    Risk Factors

The holders of General Unsecured Claims should read and carefully consider the following factors, as well as the other information set forth in this Section 2, before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

#### 2.7.1    Non-Confirmation of the Plan

Even if the voting Class votes in favor of the Plan, and even if, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which is a court of equity, may exercise substantial discretion and may choose not to confirm the Plan.  In addition, while the Plan Proponent believes the Feasibility Test and the Best Interests Test for confirmation are satisfied, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.7.2    Classification Risk

The Plan Proponent believes that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122 and applicable case law, but it is possible that a holder of a Claim may challenge the classification of Claims, and that the Bankruptcy Court may determine that a different classification is required for the Plan to be confirmed.  In that event, the Plan Proponent intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

#### 2.7.3    Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Combined Disclosure Statement and Chapter 11 Plan are correct.  The actual Allowed amount of Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

#### 2.7.4    Administrative and Priority Claims

As the number and amount of Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims are presently unknown to the Plan Proponent, it is possible that, if the actual number and amount of such Claims exceeds estimates, (i) Distributions to holders of

*ACTIVE 43402189v3*

General Unsecured Claims may be less than what was estimated in Section 2.2, or (ii) the Debtor may not have enough Cash to satisfy all such Claims in full. If the latter, and if the holders of such Claims refuse to consent to less than full payment, then the Bankruptcy Court may deny confirmation of the Plan.

### 2.7.5    Conditions Precedent to Consummation; Timing

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

### 2.7.6    Certain Tax Considerations

As discussed in Section 2.4, there may be U.S. federal, state, or local income tax consequences of the transactions proposed by the Plan to the Debtor and to holders of Claims and Interests dealt with by the Plan.

### SECTION 3          DEFINITIONS AND INTERPRETATION

#### 3.1    Definitions

The following terms used herein shall have the respective meanings set forth below:

**3.1.1    *Accrued Professional Compensation Claims*** means at any given moment, all Claims for accrued fees and expenses (including transaction or sale fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses, and subject to the budget approved in connection with the Final DIP Order. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claims.

**3.1.2    *Administrative Expense Claim*** means any Allowed Claim pursuant to Bankruptcy Code sections 503(b) and 507(a)(1)–(2) arising from actual, necessary costs or expenses of administration of the Chapter 11 Case and preservation of the Debtor's Estate.

**3.1.3    *Allowed*** means, with respect to any Claim, (i) that such Claim has been listed on the Debtor's Schedules as liquidated in amount and not disputed or contingent, and no contrary Proof of Claim has been filed, (ii) that a Proof of Claim on account of such Claim was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan, the Bankruptcy Code, and the Bankruptcy Rules, and no objection to allowance of such Claim has been interposed by a party in interest or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (iii) any Claim expressly allowed by a Final Order or pursuant to this Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and

for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtor or the Plan Administrator and without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.1.4    *Asset Purchase Agreement*** means the Asset Purchase Agreement dated as of April 6, 2019, by and between the Debtor and the Purchaser that was approved by the Bankruptcy Court in the Sale Order.

**3.1.5    *Assets*** means all tangible and intangible assets of every kind and nature of the Debtor and the Estate, including any Causes of Action and all proceeds thereof. For the avoidance of doubt, the term "Assets" excludes Purchased Assets.

**3.1.6    *Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

**3.1.7    *Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware.

**3.1.8    *Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and any local rules, procedures, or orders of the Bankruptcy Court applicable to the Chapter 11 Case.

**3.1.9    *Business Day*** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close.

**3.1.10    *Cash*** means legal tender of the United States of America.

**3.1.11    *Causes of Action*** means any and all claims, causes of action and enforceable rights of a person against third parties, or assertable by a person or on behalf of its creditors, its estate, or itself, whether brought in the Bankruptcy Court or any other forum for recovery or avoidance, that have not been settled or resolved as of the Effective Date, including: (a) obligations, transfers of property or interests in property, offsets, debt forgiveness, Cash, and other types or kinds of property or interests in property or the value thereof, recoverable or avoidable pursuant to Chapter 5 of the Bankruptcy Code or other sections of the Bankruptcy Code or any applicable law; (b) damages, whether general or statutory or exemplary, or other relief, including but not limited to actions relating to or based upon (i) indebtedness owing to a person, (ii) fraud, negligence, gross negligence, willful injury or misconduct, acts or malice, or any other tort actions, including but not limited to defamation, malicious prosecution, or tortious interference with contract, (iii) breaches of contract, (iv) violations of federal or state securities laws, (v) violations of applicable corporate, limited liability company or partnership laws, (vi) breaches of fiduciary or agency duties, including, but not limited to, the duties of care or loyalty, (vii) recharacterization, (viii) illegal dividends, (ix) misrepresentations, (x) disregard of the corporate form or piercing the corporate veil or other enterprise liability theories, (xi) corporate waste, (xii) corporate opportunity, (xiii) any theory of recovery against a lending institution not otherwise released by this Plan, including any action or any action causing harm to a person, (xiv) equitable or legal subordination, (xv) indemnity rights against third parties, or (xvi) any other action listed in Bankruptcy Rule 7001; and (c) damages or other relief based upon

20

any other claim of a person to the extent not specifically compromised or released pursuant to this Plan.

**3.1.12** *Chapter 11 Case* means the case commenced in the Bankruptcy Court by the Debtor pursuant to chapter 11 of the Bankruptcy Code.

**3.1.13** *Claim* means a "claim," as that term is described in Bankruptcy Code section 101(5), against the Debtor, property of the Debtor, or property of the Estate.

**3.1.14** *Class* means any group of Claims or Interests classified in Section 5 of this Plan pursuant to Bankruptcy Code section 1122. Classes are organized by number for type of Claim or Interest (1-6).

**3.1.15** *Collateral* means any property or interest in property of the Estate of the Debtor subject to a valid lien, charge, or other encumbrance to secure the payment or performance of a Claim.

**3.1.16** *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**3.1.17** *Confirmation Order* means any order entered by the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129.

**3.1.18** *Combined Hearing* means the combined hearing before the Bankruptcy Court to consider the adequacy of the disclosures in, and confirmation of, the Plan, which is scheduled for [•], 2019, at [•].m. (prevailing Eastern Time).

**3.1.19** *Contingent Claim* means any contingent or unliquidated Claim asserted or which may be asserted against the Debtor.

**3.1.20** *Debtor* means Avadel Specialty Pharmaceuticals, LLC or the Plan Proponent.

**3.1.21** *Disbursing Agent* means any entity, including the Debtor and the Plan Administrator, which acts as a Disbursing Agent pursuant to Section 9.4.

**3.1.22** *Disputed Claim* means a Claim, or any portion thereof, that is either (i) listed on the Schedules as unliquidated, disputed, or contingent and for which no proof of claim in a liquidated and non-contingent amount has been filed, or (ii) the subject of an objection or request for estimation that has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.

**3.1.23** *Distribution* means Cash, property, interests in property or other value distributed to holders of Allowed Claims, or their designated agents, under this Plan.

**3.1.24** *Distribution Record Date* means the date that is five (5) Business Days prior to the Confirmation Date.

21

**3.1.25** *Effective Date* means the first Business Day after the Confirmation Date on which the conditions precedent specified herein have been either satisfied or waived.

**3.1.26** *Effective Date Distributions* means all Distributions required to be made on the Effective Date under this Plan to or for the benefit of the holders of Claims that are Allowed as of the Effective Date.

**3.1.27** *Estate* means the estate created in the Chapter 11 Case containing all property and other interests of the Debtor pursuant to Bankruptcy Code section 541.

**3.1.28** *Exculpated Parties* means (a) the Debtor, (b) the Debtor's managers, members and officers in their capacity as such during the Chapter 11 Case, and (c) the Debtor's retained professionals (i.e., Greenberg Traurig, LLP; Cassel Salpeter & Co., LLC; MCA Financial Group, Ltd.; and Epiq), in each case in their capacity as such.

**3.1.29** *Final DIP Order* means the *Final Order (I) Authorizing Unsecured Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* [D.I. 90] entered by the Bankruptcy Court on March 11, 2019.

**3.1.30** *Final Order* means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, entered by the clerk of the court, which has not been reversed, vacated, or stayed, and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which it was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired. For the avoidance of doubt, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, Bankruptcy Rule 9024, or any similar procedural rule could conceivably be filed with respect to an order or judgment does not prevent such order or judgment from becoming a Final Order under this definition.

**3.1.31** *General Unsecured Claim* means any Claim that is not a Secured Claim, Administrative Expense Claim, Accrued Professional Compensation Claim, Priority Tax Claim, Other Priority Claim, or Subordinated Claim.

**3.1.32** *Impaired* means, with respect to a Claim or Interest, that such Class of Claims or Interests is impaired within the meaning of Bankruptcy Code section 1124.

**3.1.33** *Interest* means the interest of any holder of an equity security of the Debtor, within the meaning of Bankruptcy Code section 101(16), represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in the Debtor.

22

**3.1.34** *Interim Compensation Order* means the *Administrative Order Establishing Procedures for Monthly, Interim, and Final Compensation and Reimbursement of Expenses of Professionals Retained in this Chapter 11 Case and Reimbursement of Expenses of Committee Members Appointed in This Chapter 11 Case* [D.I. 85] entered by the Bankruptcy Court on March 11, 2019.

**3.1.35** *Liquidation Analysis* means the Plan Proponent's analysis of a hypothetical liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, which is attached as Appendix B hereto.

**3.1.36** *Net Distributable Assets* means the net Cash of the Estate that is available for Distribution following payment of (i) all Allowed Administrative Expense Claims, Allowed Priority Claims, Allowed Secured Claims (if applicable), and (ii) all Plan Expenses; principally the Sale Proceeds.

**3.1.37** *Other Priority Claim* means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than an Administrative Expense Claim, Accrued Professional Compensation Claim, or Priority Tax Claim.

**3.1.38** *Other Secured Claim* means any Secured Claim other than a Secured Tax Claim against the Debtor.

**3.1.39** *Plan* means this Combined Disclosure Statement and Chapter 11 Plan of Liquidation, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

**3.1.40** *Plan Administrator* means the entity nominated by the Plan Proponent at or prior to the Combined Hearing, and approved by the Bankruptcy Court in the Confirmation Order, to carry out the provisions of this Plan.

**3.1.41** *Plan Documents* means all documents, forms of documents, schedules, and exhibits to this Plan to be executed, delivered, assumed, or performed in conjunction with consummation of this Plan on the Effective Date.

**3.1.42** *Plan Expenses* means all actual and necessary fees, costs, expenses and obligations incurred by or owed to the Plan Administrator and its agents, employees, attorneys, advisors and other professionals in administering this Plan, including (a) reasonable compensation for services rendered, and reimbursement for actual and necessary expenses incurred by the Plan Administrator and its agents, employees and professionals after the Effective Date through and including the date upon which the Bankruptcy Court enters a final decree closing the Chapter 11 Case, and (b) all fees payable pursuant to Section 15.1.

**3.1.43** *Plan Proponent* means the Debtor, who is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**3.1.44** *Plan Supplement* means the compilation of all Plan Documents to be entered into as of the Effective Date and which will be filed with the Bankruptcy Court not later than ten (10) calendar days prior to the Voting Deadline.

*ACTIVE 43402189v3*

**3.1.45** *Plan Transaction* shall have the meaning ascribed to it in Section 8.2.

**3.1.46** *Priority Tax Claim* means any Allowed Claim of a governmental unit pursuant to Bankruptcy Code sections 502(i) and 507(a)(8).

**3.1.47** *Professional* means any professional firm or professional person retained by the Debtor in connection with the Chapter 11 Case pursuant to a Final Order in accordance with section 327 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

**3.1.48** *Professional Fee Reserve Amount* has the meaning ascribed to it in Section 4.2.2.

**3.1.49** *Proof of Claim* or *Proof of Interest* means a written statement conforming substantially to the appropriate official form and Bankruptcy Rule 3001 describing the basis and amount of a Claim or Interest, together with supporting documentation evidencing such Claim or Interest, which complies with applicable provisions of this Plan, the Bankruptcy Code, other Bankruptcy Rules, and any orders of the Bankruptcy Court.

**3.1.50** *Pro Rata Share* means, with respect to any Distribution on account of any Allowed Claim, the ratio that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in the same Class.

**3.1.51** *Purchased Assets* has the meaning ascribed to it in the Asset Purchase Agreement.

**3.1.52** *Purchaser* means Roivant Sciences GmbH, or its designee.

**3.1.53** *Released Parties* means (i) AUSH; (ii) AUSH's directors, officers, principals, agents, affiliates (other than the Debtor), employees, and professionals; and (iii) solely with respect to the Debtor and Estate Release in Section 13.6 of the Plan, and subject to Ferring's dismissal of any and all claims or counterclaims against the Debtor in the District Court Action, Ferring.

**3.1.54** *Releasing Parties* means (i) AUSH, and (ii) creditors who either (a) do not "opt out" of providing the releases or (b) do not object to providing the releases in Section 13.7.

**3.1.55** *Remaining Assets* means all Assets not conveyed under the Asset Purchase Agreement.

**3.1.56** *Rejection Damages Claim* means any Claim arising from, or relating to, the rejection of an executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code by the Debtor, as limited, in the case of a rejected unexpired lease, by section 502(b)(6) of the Bankruptcy Code.

24

**3.1.57** ***Reserved Causes of Action*** means all Causes of Action of the Debtor and its Estate that were not Purchased Assets.

**3.1.58** ***Sale*** means the sale of the Purchased Assets in the Chapter 11 Case pursuant to the terms and conditions of the Asset Purchase Agreement.

**3.1.59** ***Sale Order*** means the *Order (I) Authorizing the Sale of Assets of the Debtor Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Approving the Final Asset Purchase Agreement; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (VI) Granting Related Relief* [D.I. 144] entered by the Bankruptcy Court on April 15, 2019.

**3.1.60** ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor pursuant to Bankruptcy Code section 521, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules [D.I. 69-70, 152].

**3.1.61** ***Secured Claim*** means a Claim that is (i) secured by a valid and perfected lien on Collateral that is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such Collateral (a) as set forth in this Plan, (b) as agreed to by the holder of such Claim and the Debtor, or (c) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (ii) subject to a valid right of setoff under Bankruptcy Code section 553.

**3.1.62** ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of any time limitations therein), and including any related Secured Claim for penalties.

**3.1.63** ***Subordinated Claim*** means any Claim (i) that is or becomes subordinated pursuant to Bankruptcy Code section 510, (ii) of a type specified in Bankruptcy Code section 726(a)(3)-(4), or (iii) held by a partnership or corporation affiliate of the Debtor against the Debtor.

**3.1.64** ***Unimpaired*** means, with respect to a Claim or Interest, a Class of Claims or Interests that is not Impaired.

**3.1.65** ***Voting Agent*** means Epiq.

**3.1.66** ***Voting Deadline*** means the deadline by which holders of Claims eligible to vote to accept or reject the Plan must submit their ballots to the Voting Agent in order for such ballots to be considered with respect to the acceptance or rejection of the Plan.

**3.1.67** ***Voting Record Date*** means [•], 2019, the date established by the Bankruptcy Court for determining the current holders of Claims and Interests.

**3.1.68** ***Wind-Down Budget*** means the budget for wind-down of the Chapter 11 Case, which is attached as Appendix A hereto.

25

### 3.2    Interpretation: Application of Definitions and Rules of Construction

Defined terms referenced herein shall, where convenience warrants, have citations to the relevant Definition section styled as "(§ 3.1.___)." Terms that are defined in the Bankruptcy Code, and not otherwise defined herein (e.g., "affiliate," "entity," "insider," "person"), have the meanings ascribed to them in the Bankruptcy Code.

The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. Accordingly, the terms "includes" and "including" are not limiting (so, "including X" should be read as "including, but not limited to, X"). And the term "or" is not exclusive (so, "A or B" should be read as "A or B (or both)"). In addition, the following rules of construction apply:

(a)    unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan;

(b)    the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein;

(c)    the headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof;

(d)    unless otherwise provided, any reference in this Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified;

(e)    if a time or date is specified for any payments or other Distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter; and

(f)    in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## SECTION 4        ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

### 4.1    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees with the Debtor or the Plan Administrator to a different treatment, and only to the extent that any such Allowed Administrative Expense Claim has not been paid in full prior to the Effective Date, each holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim, in Cash, (a) on the Effective Date or, if not then due, then when such Allowed Administrative Expense Claim is due, (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or, if not then due, when such Allowed Administrative Expense Claim is due, (c) at such time and upon such terms as may be agreed upon by such holder and the Debtor or the Plan Administrator, as the case may be, or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

26

### 4.1.1    Administrative Expense Claim Bar Dates

By order of the Bankruptcy Court [D.I. 191], the bar date for filing requests for payment of Administrative Expense Claims (other than Accrued Professional Compensation Claims) arising on or before May 29, 2019, is **July 2, 2019**.

The holder of an Administrative Expense Claim arising on or after May 29, 2019, other than (i) an Accrued Professional Compensation Claim, (ii) an Administrative Expense Claim that has been Allowed or paid on or before the Effective Date, and (iii) fees of the United States Trustee arising under 28 U.S.C. § 1930 and any applicable interest thereon, must file with the Bankruptcy Court and serve on the Debtor, the Plan Administrator, and the Office of the United States Trustee, a request for payment of such Administrative Expense Claim so as to be received within 30 days after the Effective Date.

Failure to file and serve a request for payment of an Administrative Expense Claim timely and properly shall result in the Administrative Expense Claim being forever barred and unenforceable against the Debtor, its Estate, or its Assets.

### 4.2    Accrued Professional Compensation Claims

#### 4.2.1    Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed no later than 45 calendar days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.

#### 4.2.2    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtor no later than five (5) calendar days prior to the anticipated Confirmation Date; _provided_ that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Confirmation Date shall comprise the "Professional Fee Reserve Amount", _provided_ that the Professional Fee Reserve Amount for each Professional shall not exceed the applicable line item for such Professional in the Wind-Down Budget.

### 4.3    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees with the Debtor or the Plan Administrator to a different treatment, and only to the extent that any such Allowed Priority Tax Claim has not been paid in full prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall receive regular installment payments in Cash over a period

27

ending not later than five (5) years after the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim, together with interest accrued thereon at the applicable non-bankruptcy rate.  The Debtor and the Plan Administrator reserve the right to prepay at any time under this option.  Any Claims asserted by a governmental unit on account of any penalties and assessments shall not be Priority Tax Claims, except as provided in section 507(a)(8)(G) of the Bankruptcy Code.

## SECTION 5    CLASSIFICATION OF CLAIMS AND INTERESTS

The following table designates the Classes of Claims against and Interests in the Debtor, and specifies which of those Classes are (i) Impaired or Unimpaired by this Plan, (ii) entitled to vote on the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject this Plan, or (iv) deemed to accept this Plan.  These Classes take into account the differing nature and priority of the various Claims and Interests under the Bankruptcy Code and otherwise applicable law.  A Claim or Interest is classified in a particular Class only to the extent that any such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

| Class | Claims or Interests | Treatment | Voting Rights |
|-------|--------------------|-----------|----------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims[7] | Impaired | Entitled to Vote |
| 5 | Subordinated Claims | Impaired | Deemed to Reject |
| 6 | Interests in Avadel Specialty Pharmaceuticals, LLC | Impaired | Deemed to Reject |

## SECTION 6    TREATMENT OF CLAIMS AND INTERESTS

The treatment of Claims and Interests in each Class is specified below:

### 6.1   Class 1—Other Priority Claims

(a)    *Classification*:  Class 1 comprises all Other Priority Claims against the Debtor.

(b)    *Treatment*:  Except to the extent that the holder of an Allowed Other Priority Claim has agreed with the Debtor or the Plan Administrator to a different treatment of such Claim, and only to

---

[7]  DIP Claims are *pari passu* with General Unsecured Claims pursuant to the Final DIP Order, and therefore included in Class 4, but are not entitled to vote on the Plan.

*ACTIVE 43402189v3*

the extent that any such Allowed Other Priority Claim has not been paid in full prior to the Effective Date, each such holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; and (iii) the date for payment provided by any agreement or arrangement between the Debtor or Plan Administrator, as the case may be, and the holder of the Allowed Other Priority Claim.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Other Priority Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

## 6.2    Class 2—Secured Tax Claims

(a)    *Classification*:  Class 2 comprises all Secured Tax Claims against the Debtor.

(b)    *Treatment*:  Except to the extent that the holder of an Allowed Secured Tax Claim has agreed with the Debtor or the Plan Administrator to a different treatment of such Claim, and only to the extent that any such Allowed Secured Tax Claim has not been paid in full prior to the Effective Date, each holder of an Allowed Secured Tax Claim shall receive Cash in an amount equal to such Allowed Secured Tax Claim, together with interest accrued thereon at the applicable nonbankruptcy rate, on the later of (i) the Effective Date; (ii) the date the Secured Tax Claim becomes an Allowed Claim; and (iii) the date for payment provided by any agreement or arrangement between the Debtor and the holder of the Allowed Secured Tax Claim, provided that the Debtor and, following the Effective Date, the Plan Administrator, shall retain and shall be entitled to enforce any setoff and recoupment rights relating to any tax refund claim.  Any Claims asserted by a governmental unit on account of any penalties and assessments shall not be Secured Tax Claims, except as provided in section 507(a)(8)(G) of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Secured Tax Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Secured Tax Claims are not entitled to vote to accept or reject the Plan.

29

**6.3    Class 3—Other Secured Claims**

(a)    *Classification*:  Class 3 comprises all Other Secured Claims against the Debtor.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has agreed with the Debtor or the Plan Administrator to a different treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, each holder of an Allowed Other Secured Claim shall, at the option of the Plan Administrator, (i) be paid in full in Cash, (ii) receive the Collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive such other treatment as to render its Allowed Other Secured Claim Unimpaired, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim.

(c)    *Voting:*  Class 3 is Unimpaired, and holders of Other Secured Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

**6.4    Class 4—General Unsecured Claims**

(a)    *Classification*:  Class 4 comprises all General Unsecured Claims against the Debtor and, pursuant to the Final DIP Order, the DIP Obligations (as defined in the Final DIP Order).

(b)    *Treatment:*  Except to the extent that a holder of an Allowed Class 4 Claim has agreed to a different treatment of such Claim, and only to the extent that any such Allowed Class 4 Claim has not been paid by the Debtor prior to the Effective Date, each holder of an Allowed Class 4 Claim will receive its Pro Rata Share of the Net Distributable Assets.

(c)    *Voting:*  Class 4 is Impaired.  Therefore, holders of Allowed General Unsecured Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan, *provided* that, for avoidance of doubt, the holder of the DIP Obligations (as defined in the Final DIP Order) is not entitled to vote on the Plan.

**6.5    Class 5—Subordinated Claims**

(a)    *Classification*:  Class 5 comprises all Subordinated Claims against the Debtor.

30

(b)  *Treatment:*  Holders of Subordinated Claims will receive no Distribution on account of such Claims.

(c)  *Voting:*  Class 5 is Impaired, and holders of Subordinated Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Claims in Class 5 are not entitled to vote to accept or reject the Plan.

### 6.6  Class 6—Interests in Avadel Specialty Pharmaceuticals, LLC

(a)  *Classification*:  Class 6 comprises all Interests in the Debtor.

(b)  *Treatment:*  On the Effective Date all Interests in the Debtor will be cancelled, and holders of such Interests shall receive no Distribution on account of such Interests.

(c)  *Voting:*  Class 6 is Impaired, and holders of Class 6 Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Class 6 Interests are not entitled to vote to accept or reject the Plan.

## SECTION 7          ACCEPTANCE OR REJECTION OF THE PLAN

### 7.1  Impaired Classes

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that may receive a Distribution pursuant to this Plan may vote separately to accept or reject this Plan.  Each holder of an Allowed Claim in such an Impaired Class as of the Voting Record Date shall receive a ballot and may cast a vote to accept or reject this Plan.

Classes 5 and 6 are not entitled to receive or retain any property under this Plan and are, therefore, conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

Classes 4 is Impaired and is the only Class of Claims or Interests entitled to vote on this Plan.

### 7.2  Acceptance by a Class

A Class of Claims entitled to vote to accept or reject this Plan shall be deemed to accept this Plan if either (a) the holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that vote in such Class vote to accept this Plan or (b) no votes are received by the Voting Agent from holders of Claims in such voting Class; provided that a Class in which there are no Allowed Claims as of the Voting Record Date shall be disregarded for purposes of determining acceptance of the Plan by voting Classes.

31

Classes 1, 2, and 3 are Unimpaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 7.3    Claims and Interests Not Entitled to Vote

Holders of Claims are not entitled to vote if, as of the Voting Record Date, the Claim (a) has been disallowed or (b) is a Disputed Claim.  However, if a Claim has been disallowed in part (or a pending objection seeks disallowance of such Claim only in part) as of the Voting Record Date, the holder of such Claim shall be entitled to vote the Allowed (or undisputed) portion of the Claim.

## SECTION 8             MEANS FOR IMPLEMENTATION

### 8.1    Corporate Action

#### 8.1.1    Resignation of Managing Member and Officers

On the Effective Date and upon (i) the Debtor, or such entity designated by the Debtor, making the Effective Date Distributions, and (ii) the Debtor causing all Cash and tangible Assets of the Debtor and its Estate to be delivered to the Plan Administrator, the Debtor shall have no further duties or responsibilities in connection with implementation of this Plan, and the managing member and officers of the Debtor shall be deemed to have resigned.  From and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Debtor in the same manner as the Debtor's managing member and officers were authorized prior to the Effective date, provided that the Plan Administrator shall have no duties other than as expressly set forth in this Plan.

#### 8.1.2    Closing of Chapter 11 Case; Dissolution of the Debtor

Upon entry of a final decree closing the Debtor's Chapter 11 Case, the Debtor shall be deemed dissolved immediately and for all purposes in accordance with applicable state law.

#### 8.1.3    Cancellation of Existing Securities and Agreements

On the Effective Date, all agreements and other documents evidencing (i) any Claim or rights of any holder of a Claim against the Debtor, including any notes evidencing such Claims or (ii) any Interest in the Debtor, including any options or warrants to purchase Interests, shall be canceled.  The holders of, or parties to, such canceled agreements and documents shall have no rights arising from or relating to such agreements and documents or the cancellation thereof, except any rights provided pursuant to this Plan.

### 8.2    Plan Transactions

On the Effective Date or as soon thereafter as is reasonably practicable, the Debtor and the Plan Administrator may take any and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan (the "**Plan Transactions**"), including, but not limited to, (i) the execution and delivery of appropriate agreements or other documents of financing, merger, consolidation, restructuring,

conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law, (ii) the execution and delivery of any appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, duty or obligation on terms consistent with this Plan, (iii) the filing of appropriate certificates of incorporation or other similar documents with the appropriate governmental authorities pursuant to applicable law, and (iv) any and all other actions that the Debtor or Plan Administrator determines are necessary or appropriate.

### 8.3    Effectuating Documents and Further Transactions

Upon entry of the Confirmation Order, the Debtor and the Plan Administrator shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, or further evidence the terms and conditions of this Plan and any transactions described in or contemplated by this Plan.  The Debtor or Plan Administrator, as applicable, all holders of Claims receiving Distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### 8.4    Authority to Act

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the security holders, officers, managers, members, or other owners of the Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state or jurisdiction in which the Debtor is formed, without any further vote, consent, approval, authorization, or other action by such security holders, officers, managers, members, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

### 8.5    The Plan Administrator

On the Effective Date, the Plan Administrator will be appointed for the limited purposes of (i) liquidating the Estate's assets in accordance with this Plan, (ii) reconciling and objecting to Claims, and (iii) making Distributions on Allowed Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business.  The Plan Administrator shall be the representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code; shall stand in the shoes of the Debtor for purposes of contesting, settling or compromising objections to Claims; and shall be vested with all of the Debtor's rights and defenses to all Claims.

### 8.5.1    Powers and Duties

In furtherance of and consistent with the purposes of this Plan, the Plan Administrator shall have the following rights, powers, and duties, which the Plan Administrator shall exercise and perform, as applicable, in accordance with the Plan Administrator's reasonable business judgment for the benefit of creditors entitled to Distributions under the Plan:

33

(a)    to hold, manage, dispose of, sell, convert to Cash, and Distribute the Assets of the Debtor and the Estate;

(b)    to investigate, prosecute, settle, liquidate, dispose of, and/or abandon any Retained Causes of Action;

(c)    to implement and enforce the terms of the Plan;

(d)    if a purpose would be served, to reconcile and object to Claims and manage, control, prosecute and/or settle on behalf of the Estate any objections to Claims;

(e)    to act as a signatory of the Debtor and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales or other disposition of any Remaining Assets;

(f)    to dispose of the books and records transferred to the Plan Administrator in a manner deemed appropriate by the Plan Administrator; provided, however, that the Plan Administrator shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtor or its current or former officers or managing members are a party or that may pertain to General Unsecured Claims without further order of the Bankruptcy Court;

(g)    to take all necessary action and file all appropriate motions to obtain an order and a Final Decree closing the Chapter 11 Case;

(h)    to enter into and exercise rights under contracts that are necessary or desirable to the implementation of this Plan and administration of the Estate, and to execute any documents or pleadings related to the liquidation of the Assets of the Debtor and the Estate;

(i)    to establish and maintain bank accounts and terminate such accounts as the Plan Administrator deems appropriate;

(j)    without prior Bankruptcy Court order or approval, to engage and provide reasonable compensation and reimbursement of expenses to employees and professionals, to assist the Plan Administrator with respect to its responsibilities under the Plan;

(k)    to reasonable compensation and reimbursement of expenses, the terms of which compensation shall be disclosed at or prior to the Combined Hearing and approved by the Bankruptcy Court in the Confirmation Order; and

(l)    to take such other and further actions as are permitted by the Plan and are not inconsistent with the Plan.

### 8.5.2  Plan Expenses

All Plan Expenses shall be paid from the Estate's Assets, and the Plan Administrator may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Plan Expenses.

### 8.5.3    Indemnification

To the fullest extent permitted by applicable law, the Plan Administrator shall be entitled to indemnify, defend, and hold itself harmless from and against any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever arising out of or resulting from the Plan Administrator's acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan or the discharge of its duties hereunder, including relating to any action, suit, proceeding or investigation brought by or threatened against the Plan Administrator; provided, however, that no such indemnification will be made to the Plan Administrator on account of claims or liabilities arising out of or relating to any act or omission of the Plan Administrator that is determined by a Final Order to have constituted a crime, willful misconduct, or gross negligence.  Any indemnity to which the Plan Administrator becomes entitled pursuant to this Section 8.5.3 shall constitute and be payable as a Plan Expense.

## SECTION 9          DISTRIBUTIONS

### 9.1    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor, or its respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtor and the Plan Administrator shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date.  The Debtor, the Plan Administrator, and any party responsible for making Distributions shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 9.2    Date of Distributions

Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in this Plan, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 9.3    No Postpetition Interest on Claims

Except as otherwise provided in Section 4.3, 6.1, 6.2, or 6.3 above, postpetition interest shall not accrue or be paid on any Claims against the Debtor, and no holder of any such Claim against the Debtor shall be entitled to payment or Distributions on account of interest accruing on or after the Petition Date.

ACTIVE 43402189v3

### 9.4   Disbursing Agent

All Distributions hereunder shall be made by the Debtor, the Plan Administrator, or a named successor or assign, as Disbursing Agent, on or after the Effective Date or as otherwise provided herein.  For the avoidance of doubt, the Debtor, or such other entity designated by the Debtor, shall act as Disbursing Agent with respect to all Effective Date Distributions.   A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

### 9.5   Powers of Disbursing Agent

The Disbursing Agent may (i) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of this Plan, (ii) make all Distributions contemplated hereby, and (iii) perform such other duties as may be required of the Disbursing Agent pursuant to this Plan.

### 9.6   Surrender of Instruments

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under this Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee.  Any holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the third (3rd) anniversary of the Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate any Distribution hereunder.

### 9.7   IRS Form W-9

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under this Plan, each holder of an Allowed Claim that is entitled to a Distribution under the Plan must provide the Plan Administrator an executed IRS Form W-9 (or an acceptable substitute).  Any Allowed Claim, the holder of which fails to provide an executed IRS Form W-9 (or an acceptable substitute) within thirty (30) days after filing and service of a formal request for the same by the Plan Administrator, shall be deemed disallowed and expunged for purposes of Distributions under the Plan.

### 9.8   Delivery of Distributions

Subject to applicable Bankruptcy Rules, all Distributions to holders of Allowed Claims shall be made to the Disbursing Agent, who shall transmit such Distributions to the applicable holders of Allowed Claims or their designees.  If any Distribution to a holder of an Allowed Claim (i) is returned as undeliverable for lack of a current address or otherwise (an "**Undeliverable Distribution**"), or (ii) is not cashed or otherwise presented for collection by the holder of the Allowed Claim within ninety (90) days after mailing of such Distribution (an "**Uncashed Distribution**"), the Plan Administrator shall file with the Bankruptcy Court the

36

name and last known address of the holder of Undeliverable Distribution or Uncashed Distribution, as applicable.  If, after the passage of thirty (30) days after such filing, the payment or Distribution on the Allowed Claim still cannot be made, then (i) the holder of such Claim shall cease to be entitled to the Undeliverable Distribution or Uncashed Distribution, which will revert to the Plan Administrator, (ii) the Claim of such holder shall be deemed disallowed and expunged for purposes of further Distributions under the Plan.

### 9.9   Manner of Payment

Any Distributions to be made by or on behalf of the Debtor pursuant to this Plan shall be made by checks drawn on accounts maintained by the Debtor or the Plan Administrator, as applicable, or by wire transfer if circumstances justify, at the option of the Debtor or the Plan Administrator, as applicable.

### 9.10  Setoffs

The Debtor and the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or nonbankruptcy law, with the approval of the Bankruptcy Court and upon no less than fourteen (14) days' notice to the applicable holder of a Claim, or as may be agreed to by the holder of a Claim, may, but shall not be required to, set off against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Allowed Claim (before any Distribution is to be made on account of such Allowed Claim), any claims of any nature whatsoever that the Debtor may have against the holder of such Allowed Claim, provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Plan Administrator of any such claim the Debtor may have against the holder of such Claim.

### 9.11  Minimum Distributions

No payment of Cash in an amount of less than $50 shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be used in accordance with the Plan.  If the Cash available for the final Distribution is less than $15,000, and the Plan Administrator, in its sole discretion, determines that it would cost more than $5,000 to distribute such funds, the Plan Administrator may donate such funds to the charity of its choice.

### 9.12  Allocation of Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under this Plan includes both principal and accrued but unpaid interest, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 9.13  Distributions Free and Clear

Except as otherwise provided in this Plan, any Distribution or transfer made under this Plan, including Distributions to any holder of an Allowed Claim, shall be free and clear of any liens, Claims, encumbrances, charges and other interests, and no other entity shall have any

interest, whether legal, beneficial or otherwise, in property distributed or transferred pursuant to this Plan.

## SECTION 10          PROCEDURES FOR DISPUTED CLAIMS

### 10.1  Preservation of Rights/Defenses; Standing to Object

On the Effective Date, the Plan Administrator shall be vested with any and all rights and defenses the Debtor had with respect to any Claim immediately prior to the Effective Date. After the Effective Date, the Plan Administrator shall have standing to file objections to Claims. Any such objections shall be filed and served on or before the later of (i) 180 days after the Effective Date or (ii) such other date as may be fixed by the Bankruptcy Court after notice and a hearing.  The U.S. Trustee's right to object to Administrative Expense Claims is reserved.

### 10.2  Estimation of Claims

After the Effective Date, the Plan Administrator may (but is not required to) at any time request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim.

### 10.3  Distributions Relating to Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim, such holder's Pro Rata Share of the property distributable with respect to the Class in which such Claim belongs.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated *pro rata* to the holders of Allowed Claims in the same Class.

### 10.4  Disallowed Claims

All Claims held by persons or entities against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject this Plan.  A Claim deemed disallowed pursuant to this Section shall continue to be disallowed for all purposes until the relevant proceeding against the holder

38

of such Claim has been settled or resolved by a Final Order and any sums due to the Debtor or the Plan Administrator from such holder have been paid.

## SECTION 11      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 11.1  General Treatment

All executory contracts and unexpired leases to which the Debtor is a party, including, without limitation, that certain *Exclusive License and Assignment Agreement* dated as of September 1, 2017 by and between the Debtor and Serenity (referred to herein as the License Agreement), are hereby rejected as of the Effective Date except for an executory contract or unexpired lease that (i) previously has been assumed pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated as an executory contract or unexpired lease to be assumed in this Plan or any Plan Supplement, or (iii) is the subject of a separate assumption motion filed by the Debtor under section 365 of the Bankruptcy Code prior to the Effective Date.

Assumption of any executory contract or unexpired lease pursuant to this Plan or otherwise shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.  Any Claim listed in the Schedules and any Proofs of Claim filed with respect to any executory contract or unexpired lease that has been assumed prior to the Effective Date shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other entity.

### 11.2  Rejection Damages Claims

In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to this Plan results in a Rejection Damages Claim in favor of a counterparty to such executory contract or unexpired lease, such Rejection Damages Claim, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, its Estate, or its property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Plan Administrator on or before the date that is thirty (30) days after the Effective Date or such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults.  All Allowed Rejection Damages Claims shall be treated as General Unsecured Claims pursuant to the terms of this Plan.

### 11.3  Reservation of Rights

The inclusion of any contract or lease in the Schedules or in any Plan Supplement shall not constitute an admission by the Debtor that such contract or lease is in fact an executory contract or unexpired lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or Plan Administrator, as applicable, may elect within thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan by filing a notice of such election on the docket of the Chapter 11 Case.

39

**SECTION 12        CONDITIONS PRECEDENT TO EFFECTIVE DATE**

### 12.1  Conditions Precedent

The occurrence of the Effective Date of this Plan is subject to the following conditions precedent:

(a)        the Plan has been accepted by the voting Class of General Unsecured Claims;

(b)        the Confirmation Order shall have been entered by the Bankruptcy Court and shall be a Final Order;

(c)        Ferring shall have dismissed, with prejudice, any and all claims (including, but not limited to, its counterclaims) against the Debtor in connection with the District Court Litigation;

(d)        all actions, documents, and agreements necessary to implement this Plan and any Plan Transactions, shall have been effected or executed;

(e)        the Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement this Plan and any Plan Transactions and that are required by law, regulation, or order;

(f)        the absence of any pending or threatened government action or any law that has the effect of or actually does prevent consummation of any Plan Transactions; and

(g)        there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by this Plan from being consummated.

### 12.2  Waiver of Conditions

Unless otherwise specifically provided in this Plan, the conditions set forth in Section 12.1 may be waived in whole or in part by the Debtor or Plan Administrator, without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

### 12.3  Effect of Failure of Conditions

If the conditions precedent specified in Section 12.1 have not been satisfied or waived by the Debtor or Plan Administrator within one hundred twenty (120) days after the Confirmation Date, which period may be extended, then (i) the Confirmation Order shall be vacated, (ii) no Distributions under this Plan shall be made, (iii) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date, as though the Confirmation Date never occurred, and (iv) all of the Debtor's obligations with respect to Claims and Interests shall remain unchanged, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims or Interests by or against

the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor or otherwise.

## SECTION 13    EFFECT OF CONFIRMATION

### 13.1  Vesting of Assets

On the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and 1141(c), all Assets of the Debtor and the Estate, including Cash and the Retained Causes of Action, shall vest in the Plan Administrator free and clear of all Claims, liens, encumbrances, charges, and other interests except as otherwise expressly provided in this Plan.

### 13.2  Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor and all present and former holders of Claims against and Interests in the Debtor, regardless of whether any such holder of a Claim or Interest has voted or failed to vote to accept or reject this Plan and regardless of whether any such holder of a Claim or Interest is entitled to receive any Distribution under this Plan.

### 13.3  Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the relative legal, equitable, and contractual rights of the holders of General Unsecured Claims, Subordinated Claims, and Equity Interests in the Debtor with respect to Distributions from the Debtor's Estate.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of all compromises and settlements embodied in the Plan, as well as a finding by the Bankruptcy Court that such compromises and settlements are in the best interests of the Debtor, its Estate, and holders of Claims and are fair, equitable, and reasonable, provided that, pursuant to section 1141(d)(3) of the Bankruptcy Code, and notwithstanding anything to the contrary in this Plan, the Debtor shall not receive a discharge of indebtedness.

After the Effective Date, the Plan Administrator, on behalf of the Estate, may, and shall have the exclusive right to, compromise and settle any claims and any Causes of Action against any other person or entity without notice to or approval from the Bankruptcy Court, including any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.

### 13.4  Injunction

**Except as otherwise expressly provided in this Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all persons and entities who have held, hold or may hold Claims against or Interests in the Debtor, are permanently enjoined, on and after**

41

the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Estate, the Plan Administrator, or any property of the Debtor, the Estate, or the Plan Administrator, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, the Estate, the Plan Administrator, or any property of the Debtor, the Estate, or the Plan Administrator, on account of any such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind against any property of the Debtor, the Estate, or the Plan Administrator on account of any such Claim or Interest; (d) asserting any right of setoff of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor or the Estate on account of any such Claim or Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind with respect to any claims and Causes of Action which are retained pursuant to this Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtor, the Plan Administrator, and their respective affiliates, employees, advisors, officers and directors, or agents.

### 13.5  Term of Injunctions or Stays

Except as otherwise provided in this Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under this Plan, (a) all injunctions with respect to or stays against an action against property of the Debtor's Estate arising under or entered during the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, and in existence on the Confirmation Date, shall remain in full force and effect until such property is no longer property of the Debtor's Estate, and (b) all other injunctions and stays arising under or entered during the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Case is closed pursuant to a Final Order of the Bankruptcy Court or (ii) the date that the Chapter 11 Case is dismissed pursuant to a Final Order of the Bankruptcy Court.

### 13.6  Debtor and Estate Releases

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties (§ 3.1.53) are deemed released and discharged by the Debtor and its Estate to the fullest extent permitted by applicable law, as such law may be extended or interpreted subsequent to the Effective Date, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor or its Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor and its Estate would have been legally entitled to assert in its own right, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the negotiation, documentation, and

42

consummation of the Sale, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any of the Released Parties, the District Court Litigation, the negotiation, formulation or preparation of the Plan, the Plan Documents, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to have constituted a crime, willful misconduct, or gross negligence; **provided**, **however**, that the foregoing release shall not affect any obligation or liability (i) of the Purchaser under the Asset Purchase Agreement or the Sale Order, or (ii) arising post-Effective Date under the Plan or in connection with any Plan Transaction.

### 13.7  Releases by Certain Holders of Claims

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties (§ 3.1.53) are deemed released and discharged by the Releasing Parties (§ 3.1.54) to the fullest extent permitted by applicable law, as such law may be extended or interpreted subsequent to the Effective Date, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the negotiation, documentation, and consummation of the Sale, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any of the Released Parties, the District Court Litigation, the negotiation, formulation or preparation of the Plan, the Plan Documents, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to have constituted a crime, willful misconduct, or gross negligence; **provided**, **however**, that the foregoing release shall not affect any obligation or liability (i) of the Purchaser under the Asset Purchase Agreement or the Sale Order, or (ii) arising post-Effective Date under the Plan or in connection with any Plan Transaction. For the avoidance of doubt, a release of the Purchaser pursuant to this Section shall not affect any (i) "Assumed Liability" of the Purchaser as defined in the Asset Purchase Agreement or (ii) obligation or liability of the Purchaser arising in connection with the operation of the "Business" after the "Closing Date," both as defined in the Asset Purchase Agreement.

### 13.8  Exculpation

Upon and effective as of the Effective Date, the Exculpated Parties (§ 3.1.28) will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e).

43

**The Exculpated Parties shall neither have nor incur any liability to any entity for any postpetition act taken or omitted to be taken on or before the Effective Date in connection with, or related to, the Chapter 11 Case, including with respect to (i) the negotiation, documentation, and consummation of the Sale and any contract, instrument, release or other agreement or document created or entered into in connection with the Sale, and (ii) the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and effectuation of the Plan and any contract, instrument, release or other agreement or document created or entered into in connection with the Plan; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted a crime, willful misconduct, or gross negligence.**

### 13.9  Retention of Causes of Action/Reservation of Rights

Except as otherwise expressly provided herein, including in Section 13.6, nothing contained in this Plan, the Plan Documents, or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable right or defense that the Plan Administrator may choose to assert on behalf of the Debtor's Estate under any provision of the Bankruptcy Code or any applicable nonbankruptcy law or rule, common law, equitable principle, or other source of right or obligation. No entity may rely on the absence of a specific reference in this Plan to any Cause of Action against it as any indication that the Debtor or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against them. The Debtor and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any entity, except as otherwise expressly provided in this Plan.

## SECTION 14       RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the maximum extent permitted by law, over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

*ACTIVE 43402189v3*

(f)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     to hear and determine any application to modify this Plan in accordance with applicable provisions of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(i)     to hear and determine all requests for payment of Administrative Expense Claims;

(j)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated hereby or under any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)     to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate this Plan or to maintain the integrity of this Plan following consummation;

(l)     to hear any disputes arising out of, and to enforce any order approving alternative dispute resolution procedures to resolve, personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     to enter a final decree closing the Chapter 11 Case;

(q)     to recover all assets of the Debtor and property of the Debtor's Estate, wherever located; and

(r)    to hear and determine any Reserved Causes of Action that may be brought by the Plan Administrator, including with respect to any transfers to insiders within the year prior to the Petition Date; and

(s)    to hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtor or the Plan Administrator pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

## SECTION 15         MISCELLANEOUS PROVISIONS

### 15.1  Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 and any applicable interest thereon that are due and payable as of the Effective Date shall be paid in full in Cash by the Debtor or the Plan Administrator on the Effective Date.  All such fees and any applicable interest thereon that become due and payable after the Effective Date shall be paid by the Plan Administrator from the Estate's Assets when such fees become due and payable.  All such fees and any applicable interest thereon shall continue to become due and payable until the entry of a final decree closing the Chapter 11 Case or conversion or dismissal of the Chapter 11 Case, whichever is earlier.

### 15.2  Substantial Consummation

On the Effective Date and the commencement of Distributions under this Plan, this Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

### 15.3  Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate as a debtor in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court and submit to the United States Trustee regular post-confirmation status reports every three months, on or before the 15th day of each of January, April, July, and October as appropriate, until the Chapter 11 Case is closed, converted, or dismissed.

### 15.4  No Retroactive Tax Exemption

For the avoidance of doubt, nothing in this Plan is intended, nor shall it be construed, to provide a tax exemption under section 1146(a) of the Bankruptcy Code on account of any transfer of assets occurring prior to the Confirmation Date.

### 15.5  Determination of Tax Liabilities

The Debtor or the Plan Administrator, as applicable, shall, pursuant to section 505(b) of the Bankruptcy Code, have the right to request an expedited determination of any unpaid liability of the Debtor's Estate for any tax incurred during the administration of the Chapter 11 Case.  As

46

of the Effective Date, the Plan Administrator will be responsible for preparing and filing any tax forms or returns on behalf of the Debtor's Estate; provided, however, that the Plan Administrator shall not be responsible for preparing or filing any tax forms for holders of Interest in the Debtor (which Interests shall be canceled pursuant to this Plan), but shall provide such holders with any information reasonably required to prepare such forms.

### 15.6 Amendments

### 15.6.1 Modifications to Plan

This Plan may be amended, modified, or supplemented by the Plan Proponent at any time before substantial consummation of the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, provided that notice and an opportunity to object shall be provided with respect to any material post-confirmation modifications to this Plan. In addition, after the Confirmation Date, the Plan Proponent may institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan. For the avoidance of doubt, nothing in this Section 15.6.1 shall authorize this Plan to be modified such that it fails to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code.

### 15.6.2 Other Amendments

The Plan Proponent may make appropriate non-material, technical adjustments and modifications to this Plan prior to the Effective Date without further order or approval of the Bankruptcy Court.

### 15.7 Revocation or Withdrawal of the Plan

The Plan Proponent reserves the right to revoke or withdraw this Plan at any time prior to the Effective Date, provided that such action may only be taken if it is in the exercise of the Plan Proponent's fiduciary duty to creditors. If the Plan Proponent takes such action, this Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Plan Proponent or any other person or to prejudice in any manner the rights of the Plan Proponent or any person in further proceedings involving the Debtor.

### 15.8 Savings Clause

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable as proposed, the Bankruptcy Court, at the request of the Plan Proponent, shall have the power to alter or interpret such term or provision so as to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by

47

such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 15.9  Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of this Plan and the transactions consummated or to be consummated in connection therewith.

### 15.10   Effective Notice

All notices, requests, and demands to or upon the Plan Proponent in connection with this Plan shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered to the following recipients:

(a)    Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Attn:   Paul J. Keenan Jr.
John R. Dodd
Email: keenanp@gtlaw.com
doddj@gtlaw.com

-and-

(b)    Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Attn:   Dennis A. Meloro
Email: melorod@gtlaw.com

## SECTION 16          CRAMDOWN REQUEST

The Plan Proponent hereby requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Plan Proponent reserves the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plan.

Dated: June 10, 2019

AVADEL SPECIALTY PHARMACEUTICALS, LLC

_____

By:    Gregory J. Divis
Its:    President

## APPENDIX A

**Wind-Down Budget**

[To be Included in the Plan Supplement]

**<u>APPENDIX B</u>**

**Chapter 7 Liquidation Analysis**

[To be Included in the Plan Supplement]